UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| JACQUELINE GARCÍA-NAVARRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:17-cv-01271-JAW |
| | ) | |
| HOGAR LA BELLA UNIÓN, INC., | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON CROSS MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT AND MOTION FOR SANCTIONS**

In this complicated wrongful death action arising under Puerto Rico law, the plaintiff seeks to recover damages against the tortfeasor's insurer. The tortfeasor entered into a settlement agreement with the plaintiff in which the tortfeasor (1) accepted all liability alleged in the plaintiff's complaint, (2) waived apportionment of liability, and (3) assigned to the plaintiff its crossclaims for bad faith against its insurer. The tortfeasor's insurer was not a party to this agreement. In a damages-only trial between the plaintiff and tortfeasor in which the insurer elected not participate, the jury awarded $950,000.00 in damages against the tortfeasor.

There are three sets of remaining claims: first, the plaintiff Jacqueline García-Navarro's direct action against defendant Universal Insurance Company (Universal), the tortfeasor's, Hogar La Bella Unión. Inc. (Hogar) insurer; second, Ms. García-Navarro's statutory bad faith action under Law 247; and, third, Ms. García-Navarro's assigned crossclaims from the tortfeasor Hogar against Universal for (1) bad faith denial of coverage and (2) bad faith refusal to settle within the policy limits, which

were assigned to the plaintiff in the settlement agreement.  Before the Court are Ms. García-Navarro's Motion for Partial Summary Judgment (ECF No. 450) and Universal's Motion for Partial Summary Judgment (ECF No. 441).

The Court grants Ms. García-Navarro's motion as to three issues.  It concludes, as a matter of law, (1) that Universal breached its duty to defend Hogar, (2) that the settlement agreement is reasonable, and (3) that Universal failed to establish that the agreement is void for fraud, collusion, or lack of good faith.  On the breach of duty to defend issue, the Court orders Ms. García-Navarro to present the Court with the claim for attorney's fees and litigation costs that are not now a matter of record.

Turning to the duty to indemnify, the Court first denies Ms. García-Navarro's motion for summary judgment as to whether Universal is barred by issue preclusion from challenging its duty to indemnify.  Next, concluding that the parties have not presented the Court with a sufficiently uncontested record to allow a resolution of the indemnity coverage issue, the Court dismisses Universal's motion for summary judgment, and for the same reason, to the extent Ms. García-Navarro is seeking a declaration of indemnity coverage, the Court dismisses without prejudice her motion for summary judgment on that issue.

In light of these rulings, the Court denies the Plaintiff's motion for Rule 11 sanctions.

## I.     PROCEDURAL HISTORY

### A.      The Complaint and Amended Complaints

On February 23, 2017, Jacqueline García-Navarro filed a civil action against Hogar, an assisted living facility, Ms. Maria Betancourt, the principal shareholder, owner, president and administrator of Hogar, and place-holder names for its insurer, alleging that Hogar and Ms. Betancourt were negligent and that their negligence caused the death of Carlina Navarro-Ayala, Ms. García-Navarro's mother, on March 26, 2016, and further alleging that Hogar's insurer provided coverage for its negligence and was liable to pay causally-related damages. *Compl.* (ECF No. 1).[1]

On March 15, 2018, Ms. García-Navarro filed a first amended complaint, adding as defendants several named insurance companies, including Universal. *First Am. Compl.* (ECF No. 72). Ms. García-Navarro expanded her allegations against Hogar to make assertions against Hogar and Ms. Betancourt, who was "the principal shareholder, owner, president, and administrator" of Hogar. *Id.* ¶ 32. Ms. García-Navarro alleged that "[b]efore Mrs. Navarro's death, Mrs. Betancourt and [Hogar's] personnel incorrectly informed the physicians in charge of Mrs. Navarro's healthcare that she was a practicing Jehovah Witness," when in fact Ms. Navarro-Ayala "was not a practicing Jehovah Witness." *Id.* ¶¶ 111-12. The First Amended Complaint alleges that "[b]ased on the incorrect information from Ms. Betancourt and [Hogar's] personnel, the physicians in charge of Mrs. Navarro's health incorrectly and negligently refrained from ordering a blood transfusion to Mrs. Navarro" and in doing so, "Mrs. Betancourt and [Hogar's] personnel negligently incurred in a clerical mistake." *Id.* ¶ 114. Ms. García-Navarro further claimed that "Mrs. Betancourt and

---

[1]     Ms. García-Navarro impleaded several other defendants, who have now resolved her claims, leaving only Hogar, Ms. Betancourt, and Universal Insurance Company as the remaining defendants.

[Hogar]'s personnel miscommunicated basic and straightforward information about Mrs. Navarro and that negligent mistake contributed to her wrongful and totally preventable death." *Id.* ¶ 115. In her First Amended Complaint, Ms. García-Navarro impleaded Universal as a defendant and alleged that Universal-issued insurance policies were in effect as of March 26, 2015, insuring Hogar and making it liable to pay the damages caused by the negligence of Hogar and Ms. Betancourt. *Id.* ¶ 154.

On May 5, 2018, Ms. García-Navarro filed a second amended complaint, expanding the negligence allegations against Hogar to include allegations of untrained staff and an understaffed facility. *See Mot. Req. Leave to File Second Am. Compl.* (ECF No. 92); *Second Am. Compl.* ¶¶ 116-25 (ECF No. 93). On June 13, 2018, Universal answered the Second Amended Complaint. *Answer to Second Am. Compl.* (ECF No. 105). On February 7, 2019, Hogar filed a crossclaim against Universal, alleging that Universal breached its insurance contract with Hogar by denying coverage, by refusing to negotiate and consider settlement, and by refusing to defend Hogar. *Crosscl. Against Co-Def. Universal Ins.* (ECF No. 179). On February 28, 2019, Universal moved to strike Hogar's crossclaim. *Mot. to Strike Crosscl.* (ECF No. 186).

Finally, on August 7, 2019, Ms. García-Navarro filed a third amended complaint to assert a bad faith claim against Universal. *Third Am. Compl.* (ECF No. 238). On July 12, 2019, the Court granted Hogar's motion to amend the complaint and dismissed Universal's motion to strike Hogar's bad faith crossclaim. *Order on Mot. to Strike Crosscl., Mot. to File Am. Compl., and Mot. in Compliance* (ECF No. 233). On August 27, 2019, Universal answered the Third Amended Complaint.

4

*Answer to Third Am. Compl.* (ECF Nos. 244); *Answer to Third Am. Compl.* (ECF No. 245).

### B.   Universal's First Motion for Summary Judgment and Judge Young's Order

On August 15, 2018, Universal filed a motion for summary judgment on the primary ground that its general commercial liability insurance policy expressly excluded from coverage all bodily injury or property damage arising from professional services rendered by Hogar in its facility. *Mot. for Summ. J.* at 3 (ECF No. 111) (*Universal's First Mot. for Summ. J.*).

On December 11, 2018, United States District Judge William G. Young held a videoconference hearing to hear oral argument on Universal's motion for summary judgment. *Tr.* (ECF No. 216).  Judge Young issued oral rulings on the motion. *Min. Entry* (ECF No. 166).  The docket entry reads:

> After hearing from counsel, the Court enters an order finding as moot 113 motion for summary judgment, *see Notice of Voluntary Dismissal* 165; granting in part and denying in part 111 motion for summary judgment; the motion is allowed as to counts relating to 9-1-1 call and denied as to remaining counts, failure to keep records and miscommunicating to treating physician.

On January 7, 2019, Universal filed a motion for reconsideration of Judge Young's ruling on its motion for summary judgment and a request for interlocutory certification. *Mot. for Recons. of Minute Order at Docket 166 and Requesting Interlocutory Cert. under 28 U.S.C.A. § 1292(B) for Order at Docket No. 166* (ECF No. 173).  Judge Young denied the motion on January 8, 2019.  *Order* (ECF No. 174).  On July 12, 2019, this Judge affirmed Judge Young's ruling "in which he concluded that

the Universal Insurance Company general commercial liability policy affords coverage for the Plaintiff's claims against its insureds [Hogar] and Maria M. Betancourt insofar as the Plaintiff claims that [Hogar] and Maria M. Betancourt failed to keep proper records and communicated erroneous information, leading to Carlina Navarro-Ayala's injuries and death." *Order on Mot. to Strike Crossclaim, Mot. to File Am. Compl. and Mot. in Compliance* at 28-29 (ECF No. 233).

On February 7, 2019, Hogar filed a crossclaim against Universal, alleging that Universal breached its insurance contract with Hogar by denying liability coverage, by refusing to negotiate and consider settlement, and by refusing to defend Hogar. *Crosscl. Against Co-Def. Universal Ins.* (ECF No. 179).   On February 28, 2019, Universal moved to strike Hogar's crossclaim.  *Mot to Strike Crosscl.* (ECF No. 186). On March 14, 2019, this case was reassigned to this Judge.  *Order Reassigning Case* (ECF No. 200).   On July 12, 2019, the Court dismissed Universal's motion to strike the crossclaim and granted Ms. García-Navarro's motion to amend her complaint. *Order on Mot. to Strike Crosscl., Mot. to File Am. Compl. and Mot. in Compliance* at 28 (ECF No. 233).

On August 7, 2019, Ms. García-Navarro filed a third amended complaint in which she alleged as a fifth cause of action a bad faith claim directly against Universal.  *Third Am. Compl.* ¶¶ 181-88 (ECF No. 238).   Universal answered the third amended complaint on August 27, 2019.  *Answer to Third Am. Compl.* (ECF No. 244).   On September 5, 2019, Hogar answered the third amended complaint and reasserted a crossclaim against Universal, again alleging that Universal breached its

insurance contract with Hogar and seeking consequential and punitive damages against Universal. *Answer to Third Am. Compl.* at 28-31 (ECF No. 245).

On October 22, 2019, two parties to this dispute—Jacqueline García-Navarro and Universal—filed a number of motions related to the upcoming jury trial. On October 25, 2019, the Court stayed most of these motions. *Am. Order* (ECF No. 327). On October 28, 2019, the Court bifurcated the tort claim from the Law 247 claim and stayed all filings related to the six motions concerning the Law 247 claim. *See Order on Bifurcation* at 7 (ECF No. 330).

As the case approached trial in the fall of 2019, Hogar and Ms. Betancourt were represented by their own, privately retained counsel and Universal by its own counsel. On October 28, 2019, Ms. García-Navarro filed an informative motion, explaining that she and Hogar had executed a settlement agreement on the liability portion of the tort claims in the pending lawsuit and asking the Court to try the tort and Law 247 claims together. *Informative Mot. Regarding Settlement and Urgent Req. for Order* (ECF No. 331). Pursuant to the settlement, Hogar and Ms. Betancourt accepted liability as to all claims asserted in the Third Amended Complaint, Hogar and Ms. Betancourt waived liability apportionment, and they assigned and transferred their crossclaim rights against Universal to Ms. García-Navarro. *Informative Mot. Regarding Settlement and Urgent Req. for Order* at 1 (ECF No. 331). On the same day, the Court issued an order on the informative motion, denying Ms. García-Navarro's renewed request to try the tort claim and the Law 247 claim before the same jury and ruling that it would proceed with a jury trial only on damages.

7

*Order re: Informative Mot. Regarding Settlement and Urgent Req. for Order* (ECF No. 332).

On October 29, 2019, Universal filed a motion requesting dismissal of the direct cause of action against it on the grounds that the settlement agreement was collusive, or reconsideration of the Court's responsive order. *Mot. Requesting Dismissal of Direct Cause of Action Against Universal Insurance on Ground of Collusion Between Claimant and Insured or, in Alternative, Req. for Recons. of Order at Docket No. 332* (ECF No. 349). Neither Ms. García-Navarro nor Hogar responded.

On October 31, 2019, Universal gave notice that it had elected not to participate in the damages trial scheduled to begin on November 4, 2019. *Notice of Universal Ins.'s Position and Non-Participation as to the Damages Only Trial that is Scheduled to Start on Nov. 4, 2019* (ECF No. 355). On October 31, 2019, the Court issued an order, correcting certain misstatements by Universal about what the Court had ruled and accepting Universal's decision not to participate in the trial. *Order on Universal Ins. Co.'s Position and Non-Participation as to the Damages Only Trial* (ECF No. 357).

The Court proceeded to trial solely on the damages element of the tort claim and on November 5, 2019, the jury issued a verdict in favor of Ms. García-Navarro and against Hogar and Ms. Betancourt, awarding Ms. García-Navarro $950,000.00 in damages. *Jury Verdict Form* (ECF No. 367). Consistent with its October 31, 2019, notice, Universal did not participate in the jury trial.

On November 30, 2020, the Court issued a sixty-eight-page order resolving a number of questions concerning how the remainder of this litigation should be structured, as well as various legal questions arising from Hogar's settlement with Ms. García-Navarro.  *Order on Pending Mots.* (ECF No. 427) (*November 30, 2020 Order*).  The Court rejected Universal's argument that the Settlement Agreement between Hogar and Ms. García-Navarro is invalid as a matter of law.  The Court found that Universal provided no basis for the Court to conclude as a matter of law that there was illicit consideration or a public policy reason to invalidate the Settlement Agreement.

On August 12, 2021, the Court issued an order in which it: (1) deferred ruling on whether and when Universal breached its duty to defend Hogar; (2) concluded that that, if presented with the question, the Supreme Court of Puerto Rico would conclude that insurers who breach their duties to defend are only liable for reasonable settlement agreements between their insureds and claimants; (3) predicted that the Supreme Court of Puerto Rico would place a prima facie burden on the plaintiff to prove the settlement agreement was reasonable under the totality of the circumstances, with the ultimate burden on the insurer to show that the settlement agreement was unreasonable by a preponderance of the evidence; and (4) deemed the reasonableness of the settlement agreement a jury-triable issue and the case ripe for summary judgment practice.  *Order on Collusion and the Duty to Defend* at 26-27 (ECF No. 438).

On November 1, 2021, Universal filed its motion for summary judgment, contending that Ms. García-Navarro's assigned bad faith claim against Universal must fail as a matter of law because Universal maintained it has had a rational basis to deny the claim and arguing that the law of the case doctrine did not apply due to intervening authority from the Supreme Court of Puerto Rico. *Universal's Mot. for Partial Summ. J. as to Pl.'s and Hogar La Bella Union's Bad Faith Claims and Request for Relief from Order at Docket No. 166* (ECF No. 441) (*Def.'s Mot.*). On December 6, 2021, Ms. García-Navarro filed her response in opposition to Universal's motion. *Opp'n to Second Mot. for Partial Summ. J. Filed by Universal Insurance at Docket No. 441* (ECF No. 457) (*Pl.'s Opp'n*). Universal replied on December 23, 2021. *Universal's Reply to Pl.'s Resp. in Opp'n at Docket No. 457* (ECF No. 463) (*Def.'s Reply*).

On November 9, 2021, Ms. García-Navarro filed her motion for partial summary judgment as to four issues: (1) that Universal breached its duty to defend Hogar; (2) that Plaintiff has met her burden of establishing the reasonableness of the settlement agreement entered into with Hogar; (3) that neither fraud, collusion nor bad faith may be relied upon to invalidate the settlement agreement; and (4) that issue preclusion bars Universal from relitigating damages, causation and liability apportionment. *Mot. for Partial Summ. J.* (ECF No. 450) (*Pl.'s Mot.*). Universal responded in opposition on December 16, 2021. *Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J. at Docket No. 450* (ECF No. 462) (*Def.'s Opp'n*). On December 29, 2021,

10

Ms. García-Navarro filed her reply.  *Brief Reply to Docket No. 462* (ECF No. 465) (*Pl.'s Reply*).

On February 11, 2022, Ms. García-Navarro filed a motion requesting Rule 11 sanctions against Universal.  *Mot. Req. Rule 11 Sanctions* (ECF No. 469) (*Sanctions Mot.*).  On March 4, 2022, Universal responded to Ms. García-Navarro's sanctions motion.  *Resp. in Opp'n to Pl.'s Mot. Req. Rule 11 Sanctions at Docket No. 469* (ECF No. 472) (*Universal Sanctions Opp'n*).

## II.    THE SUMMARY JUDGMENT FACTS[2]

### A.    Universal's Decision to Deny Coverage and the Duty to Defend

On February 23, 2017, Ms. García-Navarro filed this suit against Hogar and other codefendants.  *Pl.'s Mot., Statement of Uncontested Material Facts* ¶ 1 (PSMF); *Def.'s Opp'n, Resp. to Pl.'s Statement of Uncontested Material Facts* ¶ 1 (DRPSMF). Ms. García-Navarro alleged that Dr. Oscar García-Román, Dr. Ivonne Maestre-García, and Hogar are "jointly and severally liable for Mrs. Navarro's death and all

---

[2]      Where, as here, the parties file cross-motions for summary judgment, the Court must evaluate each motion independently and "determine 'whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'"  *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)).  For cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011).  Thus, in accordance with "the conventional summary judgment praxis," with regard to Ms. García-Navarro's motion for summary judgment and its supporting facts, the Court recounts the facts in the light most hospitable to Universal's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  In compliance with that obligation, the Court recites supported facts as true even if Ms. García-Navarro disputes them. *Id.*  Likewise, with Universal's cross-motion for summary judgment and supporting facts, the Court recounts the facts in the light most hospitable to Ms. García-Navarro's case theories consistent with record support and recites supported facts as true even if Universal disputes them.  *Id.*

other damages claim[ed][ in this case."[3]  DRPSMF ¶ 1.  Universal issued commercial

insurance policy no. 09-515-000339285 to Maria Betancourt Aulet d/b/a Hogar La

Bella Unión, subject to its own terms, conditions, and exclusions.  *See Universal Ins.*

*Co.'s Statement of Uncontested Material Facts in Support of its Mot. for Summ. J..*

Attach. 1, *Commercial Policy Declaration* (ECF No. 112).[4]  The limits of that policy

are: $300,000.00 General Aggregate; $300,000.00 Personal Injury & Advertising

Injury; $300,000.00 Each Occurrence.[5]  *Def.'s Mot.*, Attach. 1, *Universal's Statement*

*of Uncontested Material Facts in Supp. of its Mot. for Partial Summ. J. as to Pl.'s and*

*Hogar La Bella Union's Bad Faith Claims and Req. for Relief from Order at Docket*

*No. 166* (DSMF) ¶ 34; *Pl.'s Opp'n, Opp'n to Universal Insurance's Statement of*

*Uncontested Facts* (PRDSMF) ¶ 31.

---

[3]    The Court accepts Universal's qualification to Ms. García-Navarro's fact about her filing of her Complaint and has included its specific quotation of the allegations in the Complaint.  *See* DRPSMF ¶ 1.

[4]    The parties did not refile the insurance policy, but the Court found the Universal policy as an attachment to its first motion for summary judgment.  *Universal Ins. Co.'s Statement of Uncontested Material Facts in Support of its Mot. for Summ. J.*, Attach. 1, *Universal Ins. Co. Commercial General Liability Policy* at 1-53 (ECF No. 112) (*Universal Ins. Policy*).  Neither the fact that Universal insured Hogar nor the terms of the commercial general liability policy appears to be in dispute.

[5]    Universal offers the following fact, without any record citation: "At the Settlement Conference held on October 21, 2019, before Magistrate Judge Sylvia Carreno, Plaintiff expressed that she was willing to settle her claim against Universal and Hogar la Bella Unión for one million dollars ($1,000,000.00)."  DSMF ¶ 35.

Ms. García-Navarro reiterates her anti-ferret rule objections, arguing that DSMF ¶ 35 "does not contain an evidentiary proffer to support" Universal's assertion.  PRDSMF ¶ 5.

The Court strikes DSMF ¶ 35 as lacking any record citation, in violation of the Local Rules.  Moreover, the docket entry for the October 21, 20019 settlement conference lacks any reference to settlement figures.  *See Min. Entry* (ECF No. 311) ("The Court engaged the parties in meaningful conversations towards an amicable resolution. However, all settlement efforts proved futile").

Finally, although Federal Rule of Evidence 408 does not absolutely prohibit the admission of settlement offers, *see Verrier v. Bluetriton Brands. Inc.*. No. 2:20-cv-00443, 2022 U.S. Dist. LEXIS 144116, at *49 n. 179 (D. Me. Aug. 12, 2022), Universal has not explained why the settlement discussions before then Magistrate Judge Correno fit within an exception to the prohibition against evidence of settlement discussions.

Universal Insurance received notice of Ms. García-Navarro's Complaint on March 15, 2017.[6]  *Pl.'s Opp'n, Counter Statement of Uncontested Material Facts (PSAMF)* ¶ 3; *Def.'s Reply, Universal's Response to Pl.'s Counter Statement of Uncontested Facts (DRPSAMF)* ¶ 3.  In a letter dated March 17, 2017, Universal informed Hogar that it would provide neither defense nor coverage for Ms. García-Navarro's claims.  PSMF ¶ 2; DRPSMF ¶ 2.  Mr. Juan F. Dávila-Soto works for Universal, where he is both a Coverage Analyst and a Legal Division Examiner.[7] PSAMF ¶ 1; DRPSAMF ¶ 1.  Mr. Dávila-Soto is the employee who prepared and signed the March 17, 2017 letter.[8]  PSAMF ¶ 2, 4; DRPSAMF ¶ 2, 4.  To arrive at his decision to deny coverage and defense for Ms. García-Navarro's claims, Mr. Dávila-Soto reviewed no document other than the policy issued to the Hogar and the

---

[6]     Universal denies PSAMF ¶ 3 on the basis that "the document attached by Plaintiff to prove this proposed fact is an incomplete document that is not translated to English language and that only provides partial information regarding the claim handling process at Universal Insurance Company." DRPSAMF ¶ 3.  The routing slip is partially in Spanish but sets out the insured name and policy number in English and states "Notify Date: MAR/15/2017."  *Pl.'s Opp'n*, Attach. 2, *Universal Insurance Routing Slip*.  The Court rejects Universal's denial and admits PSAMF ¶ 3.

[7]     Universal denies Ms. García-Navarro's assertion that Mr. Dávila Soto is both a "Coverage Analyst and a Legal Division Examiner," submitting that "Mr. Juan F. Dávila Soto works as a Coverage Analyst for Universal Insurance Company, as he testified in the cited portion of his deposition."  DRPSAMF ¶ 1.  In the cited deposition testimony, Mr. Dávila Soto described his position as "Coverage analyst. They list the position as legal analyst and coverage analyst" and confirmed his "official position today" is "Legal Division Examiner, I have both positions."  *Pl.'s Opp'n*, Attach. 1, *Dep. Test. of Juan F. Davila Soto* at 32:16-19, 33:3-6 (*Dávila Soto Tr.*).  Moreover, Universal's own March 17, 2017 coverage letter identifies Mr. Dávila-Soto as "Legal Division Examiner."  *See Pl.'s Mot.*, Attach. 1., *March 17, 2017 Letter from Universal*.  The Court accepts PSAMF ¶ 1 as supported by the record cited.

[8]     Universal denies PSAMF ¶ 2, contending that the record cited merely supports that "Mr. Juan F. Dávila Soto was the Universal Insurance Company coverage analyst who prepared and signed the coverage denial letter" but not "that he was the only person involved in the decision as Plaintiff suggests."  DRPSAMF ¶ 2.  In support of her assertion that "Mr. Dávila-Soto is the employee from Universal Insurance who determined that coverage and defense were not to be provided for Jacqueline's claims," Ms. García-Navarro cites the entire letter from Universal to the Hogar denying coverage.  PSAMF ¶ 2 (citing *March 17, 2017 Letter from Universal*).  The Court adjusted PSAMF ¶ 2 to reflect the contents of the letter, in which Mr. Dávila Soto wrote "we will not provide defense or coverage in this case," and his signature was followed by "C: Mr. Joaquín Quintana – Insurance Producer."

Complaint dated February 23, 2017.[9]  PSAMF ¶ 5; DRPSAMF ¶ 5.  The insurance contract pursuant to which Universal denied defense and coverage contains the following clause: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damages' to which this policy applies. We will have the right and the duty to defend the insured against any 'suit' seeking those damages."  PSMF ¶ 3; DRPSMF ¶ 3.

When a complaint is amended to include new allegations against an insured to whom Universal denied coverage and defense, Universal has the obligation to analyze whether those new allegations trigger coverage for the insured and Mr. Dávila-Soto was responsible for making that determination on behalf of Universal's legal division.[10]  PSAMF ¶ 6; DRPSAMF ¶ 6.  Mr. Dávila-Soto never reviewed any of the

---

[9]     Universal denies PSAMF ¶ 5 as "a misrepresentation of the deposition testimony" because "Mr. Juan F. Dávila Soto testified that he did not request additional documents from the insured in order to evaluate the coverage for the claim."  DRPSAMF ¶ 5.  Universal insists that "[t]he coverage analysis was made based on the four corners of the complaint and the four corners of the insurance policy as the legal standard requires."  DRPSAMF ¶ 5.

In the cited deposition testimony, Mr. Dávila-Soto testified that he "analyzed the policy, analyzed the Complaint, verified everything stated in the Complaint and under [his] understanding none of the things claimed were covered, had coverage." *Dávila-Soto Tr.* at 109:4-7.  He based that understanding "on the allegations stated in the complaint", not on anything else, and did not conduct legal research into the claim. *Dávila-Soto Tr.* at 109:8-14.  He also confirmed that when he receives a claim all he does in his office is analyze that claim against the policy, that he does not talk to the insured or see any discovery in the case, and that he does not inspect any pleadings besides the complaint in the case. *Dávila-Soto Tr.* at 116:1-12.

The Court admits PSAMF ¶ 5 as supported by the cited testimony and rejects Universal's denial, which goes beyond the scope of the fact asserted.

[10]     Universal similarly denies PSAMF ¶ 6 as "a misrepresentation of the deposition testimony" because Mr. Dávila Soto testified "that at the time the Amended Complaint had been filed the case was (sic) at the legal division and he does not recall if the analysis was made and that he does not knows (sic) since he does not work at claims department."  DRPSAMF ¶ 6 (citing *Dávila-Soto Tr.* at 58).  PSAMF ¶ 6 asserts that:

When a complaint is amended to include new allegations against an insured to whom he denied coverage and defense on behalf of Universal Insurance, Mr. Dávila-Soto has the obligation to analyze whether those new allegations trigger coverage for the insured.

*Id.* (citing *Dávila-Soto Tr.* at 52-53, 56-58).

amended complaints in this case.  PSAMF ¶ 7; DRPSAMF ¶ 7.  Mr. Dávila-Soto never saw any of the documentation exchanged between the parties during discovery in this case.[11]  PSAMF ¶ 8; DRPSAMF ¶ 8.

## B.    The Professional Services Exclusion and the Court's Prior Coverage Decisions

On March 15, 2018, Ms. García-Navarro joined Universal as a defendant to the suit.  PSMF ¶ 4; DRPSMF ¶ 4.  On August 15, 2018, Universal filed a motion for summary judgment on the primary ground that its general commercial liability insurance policy expressly excluded from coverage all bodily injury or property damages arising from professional services rendered by Hogar in its facilities.  DSMF ¶ 11; PRDSMF ¶ 11; PSMF ¶ 5; DRPSMF ¶ 5.  In its motion for summary judgment, Universal alleged that under Puerto Rico Supreme Court caselaw, all services

---

In the cited deposition testimony, Mr. Dávila-Soto explained that where there are "new allegations," then "[t]he Company has to analyze if the new allegations are covered under the policy." *Dávila-Soto Dep.* at 58:1-11.  He testified he did not recall if that analysis was made in this case, and that "there [are] several persons" at Universal who do the analysis regarding new facts or allegations. *Id.* at 58:12-14, 57:1-6.  He said he was the one in charge of making that determination "[n]ot in the Company, . . . in the Legal Division."  *Id.* at 56:20-25.

The Court accepts PSAMF ¶ 6 as supported by Mr. Dávila-Soto's testimony but adjusted it to align with his testimony that he was the only one in charge of the analysis in the Legal Division, but not necessarily the single decisionmaker for Universal as a whole (as originally asserted by Ms. García-Navarro).

[11]    Again, Universal denies PSAMF ¶ 8 as "a misrepresentation of the deposition testimony" because Mr. Dávila-Soto testified "that he does not know what happened in this case during discovery." DRPSAMF ¶ 8.  Mr. Dávila-Soto confirmed at his deposition:

Mr. Dávila-Soto: And so in this case you don't know anything that happened after you received that first Complaint?
Mr. Dávila-Soto: No.
Q: Nothing related to the discovery, nothing at all.
Mr. Dávila-Soto: No.
Q: And you said you don't recall ever talking to Miss Betancourt in this case?
Mr. Dávila-Soto: No.

*Dávila-Soto Dep.* at 125:5-11.

The Court overrules Universal's objection and admits PSAMF ¶ 8 as supported by the cited deposition.  Mr. Dávila-Soto's testimony that he reviewed "nothing" related to discovery includes documentation.

rendered by geriatric homes constitute professional services and therefore, the services rendered by Hogar in this case are expressly excluded under the clear and unequivocal terms of the Designated Professional Services Exclusion contained in Hogar's General Commercial Liability Policy.   DSMF ¶ 12; PRDSMF ¶ 1.   The professional services exclusion in the Universal insurance policy reads:

### CG-2116 Designated Professional Services

### EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILTY COVERAGE PART
> SCHEDULE

Description of Professional Services:

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, this insurance does not apply to "bodily injury", "property damage," "personal injury," or "advertising injury" due to the rendering of or failure to render any professional service.

DSMF ¶ 12; PRDSMF ¶ 12.[12]

In support of its argument that the services provided by Hogar in this case were excluded under its policy with Universal as professional services, Universal cited the Puerto Rico Supreme Court's decision in *Viruet, et al. v. SLG Casiano Reyes*, 194 D.P.R. 271 (2015).  DSMF ¶ 13; PRDSMF ¶ 1.  Universal argued that, because

---

[12]    As noted earlier, the provisions of the Universal general commercial liability policy do not appear to be a matter of dispute between the parties.  Universal's statement of material fact referred to the earlier statement of material fact in its initial motion for summary judgment, where the Court found a copy of the Universal policy applicable to this case attached.

the Court sits in diversity, the Puerto Rico Supreme Court's decision in *Viruet* is controlling precedent. DSMF ¶ 14; PRDSMF ¶ 1. Universal further argued that *Viruet* controls the present case because the Supreme Court of Puerto Rico decided the case under the same General Commercial Liability Policy and Designated Professional Services Exclusion as the one issued by Universal in favor of Hogar in the present case. DSMF ¶ 15; PRDSMF ¶ 1. In its Motion for Summary Judgment, Universal cited an excerpt of *Viruet* where the Supreme Court of Puerto Rico established that:

> The main function of a City of Angels is to watch for the well-being and safety of the aged under its care. Given the nature of this kind of business, the entity is required to provide special care and attention to its residents. These services, inherent to the own endeavor of the company, necessarily entail particular knowledge and skills to be able to adequately address this population. That is how our legal system conceives it and that is why the State regulates these places rigorously.

DSMF ¶ 16; PRDSMF ¶ 1. Based on *Viruet*, Universal asked the Court to enter summary judgment in its favor since Plaintiff's allegations against Hogar all stem from its alleged failure to render professional geriatric services, and as a matter of law, these services were excluded under the clear and unequivocal terms of Hogar's policy. DSMF ¶ 17; PRDSMF ¶ 1. On December 11, 2018, Judge William G. Young held a videoconference hearing to hear oral argument on Universal's Motion for Summary Judgment. DSMF ¶ 18; PRDSMF ¶ 1. Judge Young, then the presiding judge, issued an oral ruling on Universal's Motion for Summary Judgment, holding that:

> After hearing from counsel, the Court enters an order finding as moot 113 motion for summary judgement, *see* [*Notice of Voluntary Dismissal*

17

(ECF No. 165)], granting in part and denying in part 111 motion for summary judgment; the motion is allowed as to counts relating to 9-1-1 call and denied as to remaining counts, failure to keep records and miscommunicating to treating physicians.

DSMF ¶ 19; PRDSMF ¶ 1; PSMF ¶ 6; DRPSMF ¶ 6.

In so ruling, the Court reasoned:

I can understand your argument with respect to the alleged failure to make the 911 call, and because that failure, it would seem to me, involves a certain degree of professional judgment, and therefore the exclusion most likely should apply. But for the failure with respect to, um, keeping records or the communication of erroneous information to the treating physician, um, those allegations have nothing to do with professional -- it seems to me, have nothing to do with professional services, those are the -- or at least a jury could find that those are the, um, reasonable obligations of the facility, and under your general liability policy the exclusion would not apply and your coverage would apply.
....
I'm familiar with that case [*Viruet vs. SLG Casiano-Reyes*] and you are correct to cite it, um, I simply suggest to you that you're stretching it too far. If that were the case, then virtually everything that a geriatric nursing facility does would be intertwined with professional services and you're not insuring anything, except perhaps a fire or something. I don't read the Supreme Court of Puerto Rico as going that far.
....
Here's the order of the court. Universal's motion for partial summary judgment is allowed insofar as it relates to any allegations arising out of a failure to call 911, and it's denied as it relates to the failure to keep records of personal information, um, on file and insofar as it relates to miscommunicating to the treating physician about the blood transfusion. Those allegations are not professional services and, um, the case will go forward as to those against the facility.

PSMF ¶ 7; DRPSMF ¶ 7.

On August 24, 2020, the Puerto Rico Supreme Court decided *Rivera-Matos v.*

*Commonwealth of Puerto Rico*, 204 D.P.R. 1010 (2020).  DSMF ¶ 36; PRDSMF ¶ 1.

In *Rivera-Matos*, the Puerto Rico Supreme Court addressed the "intricate part

doctrine," and considered whether the "professional services" exclusion applies to related services.[13]  DSMF ¶ 37; PRDSMF ¶ 6.

### C.    The Bad-Faith Claims

On August 7, 2019, Ms. García-Navarro filed a Third Amended Complaint. DSMF ¶ 1; PRDSMF ¶ 1.  The Third Amended Complaint included a bad faith claim against Universal.  DSMF ¶ 2; PRDSMF ¶ 1.  Ms. García-Navarro alleged that: "Negligently, recklessly and in bad faith, Universal Insurance denied coverage of the damages claimed against [Hogar], even though coverage is warranted under the clear and unequivocal terms of its policy."  DSMF ¶ 3; PRDSMF ¶ 1.  Ms. García-Navarro also alleged that, even though she indicated her willingness to settle within policy limits, Universal ignored all of those communications in bad faith and "[n]egligently, recklessly and in bad faith, Universal Insurance has refused altogether to contemplate settlement within policy limits. Indeed, all settlement communications sent by [Ms. García-Navarro] have gone unanswered by Universal Insurance.  Nor has Universal Insurance presented any settlement counteroffers."  DSMF ¶ 4; PRDSMF ¶ 1.  Additionally, Ms. García-Navarro alleged that Hogar "has indicated disposition to settle within policy limits.  [Hogar] has also expressed willingness to engage in settlement negotiations. Negligently, recklessly and in bad faith, Universal

---

[13]     Universal's fact originally read: "In *Rivera-Matos*, the Puerto Rico Supreme Court adopted the 'intricate part doctrine' regarding clerical or ordinary tasks that are integral to the professional services rendering process."  DSMF ¶ 37.

Ms. García-Navarro denies DSMF ¶ 37 as a "misleading and incorrect" "legal interpretation of jurisprudence from the Puerto Rico Supreme Court rather than a statement of fact."  PRDSMF ¶ 6. The Court rephrased Universal's fact to neutrally describe the case instead of including Universal's interpretation as an uncontested fact.

Insurance has ignored [Hogar's] disposition to settle and negotiate within policy limits." DSMF ¶ 5; PRDSMF ¶ 1.

Ms. García-Navarro's bad faith cause of action against Universal arises out of P.R. Law 247, and she alleged that: "[g]iven its negligent, reckless and bad faith posture as to settlement under policy limits, Universal Insurance is liable to cover all damages that may be awarded by a jury at trial, even if a damages award exceeds policy limits. E.g., 31 L.P.R.A. sec. 3018; *see also, e.g., Morales v. Automatic Vending Services, Inc.*, 103 D.P.R. 281, 3 P.R. Offic. Trans 390 (1975) and Law 247 of 2018." DSMF ¶ 6; PRDSMF ¶ 1. Ms. García-Navarro is seeking punitive damages under Law 247. DSMF ¶ 7; PRDSMF ¶ 1. Additionally, on September 5, 2019, codefendant Hogar filed a crossclaim for bad faith against Universal. DSMF ¶ 8; PRDSMF ¶ 1. In that Crossclaim, codefendant Hogar alleges that:

> "By denying coverage under the insurance policy it had issued, by refusing to negotiate and make reasonable settlement offer, by making unreasonable interpretations of the insurance policy, and by refusing to defend appearing defendants, Universal Insurance breached its duty of good faith and fair dealing to appearing defendants and is liable to appearing for all the damages its acts and omissions have caused appearing defendants."

DSMF ¶ 9; PRDSMF ¶ 1. [14]

---

[14]     Universal asserts that "Hogar's bad faith cause of action against Universal was not pleaded under Puerto Rico Law 247, but rather under Puerto Rico's general liability statute, Art. 1802 of the Puerto Rico Civil Code. DSMF ¶ 10.

Ms. García-Navarro denies DSMF ¶ 10, citing "the First Circuit's anti-ferret rules." PRDSMF ¶ 10. She says Universal "fails to provide pinpoint citations to the page and paragraph of the Hogar's Crossclaim where it is allegedly stated that Article 1802 . . . constitutes the statutory predicate for that suit" and that DSMF ¶ 10 "directly contradicts expressed allegations of the Crossclaim setting forth bad faith claims under a breach of contract theory." PRDSMF ¶ 10 (citing *Answer to Third Am. Compl.* at 29-30, ¶¶ 3-7 (ECF No. 245)). She insists that "contrary to Universal Insurance's misleading and incorrect contentions, the Hogar's Crossclaim sounds in contract rather than in tort." PRDSMF ¶ 10.

### D.    Ms. García-Navarro's Trial Preparation

In preparing her case, Ms. García-Navarro retained three experts: a physician, a psychiatrist, and an expert on insurance practices in Puerto Rico.  PSMF ¶ 17; DRPSMF ¶ 17.  Each expert provided an expert report.  PSMF ¶ 18; DRPSMF ¶ 18.

---

In reply, Universal says Hogar's answer to the Third Amended Complaint "specifically supports" DSMF ¶ 10 with "the allegation that Universal supposedly 'breached its duty of good faith and fair dealing to appearing defendant [Hogar] and is liable to appearing for all the damages its acts and omissions have caused appearing defendants.'"  Reply to PRDSMF ¶ 10 (quoting *Answer to Third Am. Compl.* at 30).  Because "Hogar[]has pleaded a Law 274-2018 cause of action, which sets forth a private cause of action for alleged breach of specific Insurance Code sections," even as an "alleged 'breach of insurance contract,' under Puerto Rico law the only remedy available" to Hogar is "a bad faith tort cause of action" under Article 1802 of the Civil Code.  *Id.*

The parties dispute whether Hogar's assigned crossclaims against Universal for (1) bad faith denial of coverage and (2) bad faith refusal to settle within the policy limits sound in contract or in tort.  This matter has yet to be decided by the Puerto Rico Supreme Court.  *See Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 41 n.3 (1st Cir. 2001) ("the question of whether a bad faith denial of an insurance claim is an issue of contract or tort is a matter of state law that has not yet been addressed by the courts of Puerto Rico."); *see also Noble v. Corporacion Insular de Seguros*, 738 F.2d 51, 53 (1st Cir. 1984) (deciding that such an action would fall under either Civil Code Article 1802, 31 L.P.R.A. § 5141 (tort), or Article 1504, 31 L.P.R.A. § 3018 (contract)); *but see Event Producers Inc. v. Tyser & Co.*, 854 F. Supp. 35, 38-39 (D.P.R. 1993) (concluding that the Puerto Rico Supreme Court would probably follow the trend in most states and allow a tort action for bad faith refusals to pay insurance).

In *Noble,* 738 F.2d at 53, the First Circuit acknowledged the availability of a separate action for wrongful refusal to pay a policy claim and upheld the insurer's liability for ensuing damages but stayed clear of making this determination. The First Circuit noted that liability for additional damages for breach of contract emanates from provisions of the Puerto Rico Civil Code which require good faith in the performance of a contract and impose liability for breach of contractual obligations.  *Id.*  Article 1210, 31 P.R. Laws Ann. § 3375 provides that parties to a contract bind themselves "not only with regard to the fulfillment of what have been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use and law." Further, pursuant to article 1054, 31 P.R. Laws Ann. § 3018, a party found to have incurred in "fraud, negligence, or delay" or having acted contrary to its contractual obligations shall be liable "for the losses and damages caused thereby." *King v. TL Dall. & Co., Ltd.*, 270 F. Supp. 2d 262, 269 (D.P.R. 2003) (finding that conduct charged by plaintiff in his claims for breach of contract and bad faith denial of his insurance claim must fall within the contractual ambit since any liability arising therefrom is premised on pre-existing contractual obligations).

The Court rejects Universal's legal conclusion regarding the source of Hogar's bad faith cause of action.  *See Answer to Third Am. Compl.* (containing no citation to either Law 247 or Article 1802); *See id.* ("Art. 1802 liability is not based on the failure to comply with duties assumed by the parties but rather by duties imposed by the need for social order").  The Court omits DSMF ¶ 10.

"Rule 56(e) sets forth in mandatory terms the result of failure to follow Rule 56(c): 'Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, *shall be deemed admitted unless properly controverted.*'"  *CMI Capital Mkt. Inv., LLC v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008) (emphasis in original) (quoting D.P.R. Loc. R. 56(e)).  The First Circuit has repeatedly advised that "parties ignore the strictures of an 'anti-ferret' rule at their peril.  *P.R. Am. Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 131 (1st Cir. 2010).

Ms. García-Navarro had available for presentation at trial an investigative report rendered by an agency of the Puerto Rico Government, the Mental Health and Anti-Addiction Services Administration (ASSMCA), after an investigation into the death of her mother at Hogar.  PSMF ¶ 8; DRPSMF ¶ 8.  Ms. García-Navarro persuaded the governmental employee who directed the investigation and authored the investigative report to testify at trial.  PSMF ¶ 11; DRPSMF ¶ 11.

During discovery, Ms. García-Navarro took six depositions.  PSMF ¶ 13; DRPSMF ¶ 13.  Ms. García-Navarro deposed Hogar's owner and two of its caretakers; the doctor and the nurse who visited Hogar to provide medical care to her mother, and the administrator of the corporation which employed the doctor and the nurse.  PSMF ¶ 14; DRPSMF ¶ 14.  The nurse testified that Hogar personnel told him that Jacqueline's mother was a Jehovah's Witness who could not receive a blood transfusion.  PSMF ¶ 15; DRPSMF ¶ 15.  The nurse also testified that, while Hogar's personnel was informing Ms. García-Navarro via text messages that her mother was well, her mother had been refusing to eat and had a hemoglobin level of 4.5 grams.  PSMF ¶ 16; DRPSMF ¶ 16.  Ms. García-Navarro obtained text messages[15] reflecting

---

[15]    Universal only admits that Ms. García-Navarro obtained a copy of these text messages, asserting that she "has not shown the lack of a genuine dispute as to the truth of the matter asserted in those messages." DRPSMF ¶ 12.  It is premature to exclude the statements as hearsay at the motion for summary judgment stage.  While the statements of providers may be hearsay, the Court cannot be certain.  Ms. García-Navarro may not be offering the statements for their truth, but for another purpose such as showing that she engaged in text messaging with Ms. Betancourt or the effect that their communications had on her.  Regardless, these texts were admitted into evidence at trial on November 5, 2019 as Ms. García-Navarro's exhibits 7, 7-A and 7-B.  *See Pl.'s Ex. List* (ECF No. 370).  The Court overrules Universal's objection and includes the set of messages in its recitation of the summary judgment facts.

her communications with Hogar personnel in the days that preceded the death of her

mother:

**Monday, March 21, 1:03 PM**
**Ms. Betancourt:** Call me when you can, It's not urgent but I need to talk to you, María.

**Monday March 21, 2:52 PM**
**Ms. García-Navarro:** Maria I'm going to send you money to buy Ensures from Mami. I'll call you when I'm at Walmart to send you a money gram. Thanks for everything.
**Ms. Betancourt:** Okay, it is not enough with what I'm buying, and thanks with that I buy more and I give it to her 3 to 4 times a day. I talked to her and I told her that I had talked with you and that you wanted her to eat, and she said yes to me in a whisper and nodded with the head; she is a baby.
**Ms. García-Navarro:** My beautiful baby. God willing she keeps eating.
**Ms. Betancourt:** In God we trust, yes.

Monday, March 21, 5:44 PM
**Ms. García-Navarro:** Maria, the transaction number is 628144631. Anything comes up, call me. I sent $ 40.00. Thank you.
**Ms. Betancourt:** Okay, thanks.

Tuesday, March 22, 8:43 AM
**Ms. García-Navarro:** 407-273-4331 Ask for Mrs. Jacky and they'll call me. Thanks for taking care of my mom ;)
**Ms. Betancourt:** today she ate a lot and she has been very alert. And I told her to blow you a kiss [Laugh] he, he.

**Tuesday, March 22, 2:01 PM**
**Ms. García-Navarro:** Oh, how beautiful, how good that she has eaten. I'm more at ease. Thanks for keeping me updated.
**Ms. Betancourt:** Okay

**Wednesday, March 23, 10:13 AM**
**Ms. García-Navarro:** Good morning Maria. I called the Home to find out about Mom. They told me she ate at breakfast. If you can, let me know about the rest of the day to see how it goes, thank you.

**Wednesday, March 23, 5:36 PM**
**Ms. García-Navarro:** Maria, how did mommy do today?

**Ms. Betancourt:** Everything was fine with her; she had labs in the morning. The doctor…

**Wednesday, March 23, 7:23 PM**
**Ms. García-Navarro:** Maria, forgive me for texting, I want to know about mommy. Yesterday I called the "Hogar" and your mother told me what she ate and wanted to know how she did today.
**Ms. Betancourt:** The doctor saw her yesterday and found she is better with the vitamins, she is eating, and hemoglobin is still low and he started injections for 7 days; she had lab tests done and it is still low. The treatment is back, I explained to him about your religion and he will get it to rise without having to give her a transfusion, provided she improves.
**Ms. García-Navarro:** Is it very low? The hemoglobin?
**Ms. Betancourt:** I did not realize how much, he was with the male nurse.
**Ms. García-Navarro:** Oh okay, but if it does not improve with the injections let the doctor do whatever he thinks is more convenient.  I really would not like her to have more blood transfusion because even though Mami is not a Jehovah's Witness that is very risky at times.  But let me know and I will tell my uncle to go to the Home and do the paperwork if necessary. If you need something, you let me know. I will call the "Hogar" later in the afternoon.
**Ms. Betancourt:** Okay. Let's see how she does and I will tell you.
**Ms. García-Navarro:** Okay, thank you. I'll inform my uncle and we'll keep in touch for anything. I hope she get better soon.
**Ms. Betancourt:** Okay

PSMF ¶ 12; DRPSMF ¶ 12.

### E.    The Settlement Agreement

On October 26, 2019, Ms. García-Navarro and Hogar executed a settlement agreement.  PSMF ¶ 19; DRPSMF ¶ 19.  According to Hogar's trial attorney, "the settlement agreement executed with Ms. García-Navarro constituted the only alternative available to eliminate the risk that a jury verdict would impinge upon

[Hogar]'s ability to remain a going concern."[16]   PSMF ¶ 20.   Hogar's trial attorney

also declared:

> [Hogar] is licensed by the Puerto Rico Government to provide services to mentally incapacitated adults. [Hogar] provides assisted-living services for up to 32 residents, 24 hours a day, 7 days a week. The Puerto Rico Government pays for the services [Hogar] provides.  The revenue derived from [Hogar]'s services is not substantial. It barely covers salaries and other operational expenses.  In Federal Court, a judgment for Ms. García-Navarro would have potentially prompted [Hogar] to file for bankruptcy. In turn, a bankruptcy filing would have presented the risk that the Puerto Rico Government withdraw the license pursuant to which [Hogar] operates.
>
> Before the filing of Ms. García-Navarro's suit, the Puerto Rico Government conducted an administrative investigation into the death of Ms. García-Navarro's mother. As part of the investigation, [Hogar]'s personnel as well as personnel from the third-party providers in charge of the medical care of Ms. García-Navarro's mother were interviewed. The Puerto Rico Government rendered a detailed investigative report concluding that institutional negligence at [Hogar] caused the death of Ms. García-Navarro's mother.
>
> During litigation in Federal Court, over my written objections, the judge presiding over the case granted a motion in limine allowing Ms. García-Navarro to preset to the jury the investigative report and its findings.  A trial thus presented the risk that a jury would weight the investigative report and its findings against [Hogar] and issue judgment for Ms. García-Navarro.  The jury could also rely on text messages sent

---

[16]   Universal admits "that Hogar's trial attorney made those statements" but denies the contents as "inadmissible opinion and not facts."  DRPSMF ¶ 20; *see Pl.'s Mot.*, Attach. 4, *Ramón M. González Decl.*

   Federal Rule of Civil Procedure 56(c)(4) requires that declarations used to support a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that would be inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment"); FED. R. EVID. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter").  A declaration used to support a motion for summary judgment must be factually specific and explain the basis for the declarant's knowledge, and the Court may disregard inadmissible portions, keeping in mind that "personal knowledge is the touchstone." *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)).

   The Court is aware of the distinction between fact and opinion, and will enforce the distinction. *See Livick v. The Gillette Co.*, 524 F.3d 24, 28 (1st Cir. 2008) ("requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise" (quoting *Perez*, 247 F.3d 303, 316 (1st Cir. 2001))) (internal quotations omitted).The Court admits PSMF ¶ 20, which presents Hogar's trial attorney's own assessment of the settlement and his client's trial risks, over Universal's objection.

from [Hogar] to Ms. García-Navarro days before the death of her mother. In those text messages, Ms. García-Navarro was informed that her mother was well. Nevertheless, available evidence shows that, when the text messages were written, Ms. García-Navarro's mother had a hemoglobin level of 4.5 grams. It is my professional opinion, based on more than 30 years of legal practice, that the evidence proffered by Ms. García-Navarro in pretrial memoranda presented a real risk of an adverse judgment for Bella Unión. I explained to my client those risks as well as their potential implications for its ability to continue in operation. I also explained that the financial risk had magnified exponentially because Bella Unión's insurer refused to provide a defense and continued to stubbornly deny coverage.[17]

PSMF ¶ 21; DRPSMF ¶ 21. The settlement agreement did not stipulate a monetary amount for Ms. García-Navarro's damages. PSMF ¶ 22; DRPSMF ¶ 22. The settlement agreement stipulated that Ms. García-Navarro would have to present her damages claim at trial for a jury to determine the applicable damages award, if any. PSMF ¶ 23; DRPSMF ¶ 23.

The Settlement Agreement executed between Ms. García-Navarro and Hogar contains a covenant not to execute by which she agrees to not execute judgment against Hogar. *Def.'s Opp'n, Universal's Additional Statement of Uncontested Material Facts* (DSAMF) ¶ 1; *Pl.'s Reply, Answer to Counterstatement of Undisputed Material Facts* (PRDSAMF) ¶ 1. The Settlement Agreement also contains a waiver of liability apportionment and an admission of liability from Hogar as to all claims alleged in the Complaint. DSAMF ¶¶ 2, 3; PRDSAMF ¶ 1. Before she reached an agreement with Hogar, Ms. García-Navarro entered into settlement agreements with

---

[17]    Universal denies the contents of the statements by Hogar's trial attorney as "inadmissible opinion and not facts." DRPSMF ¶ 21. For the same reasons explained in the previous footnote, the Court admits PSMF ¶ 21 as supported by the record cited. In his declaration, Hogar's trial attorney made clear that he was expressing his "professional opinion" about Hogar's trial risks.

joint tortfeasors and co-defendants Dr. García-Román, IMF, and Dr. García-Maestre, fully releasing them from all liability in this case.  DSAMF ¶ 4; PRDSAMF ¶ 1.

F.    The 2019 Damages Trial

On October 30, 2019, during a last pretrial hearing, Ms. García-Navarro expressly invited Universal to participate in the damages trial.  PSMF ¶ 24; DRPSMF ¶ 24.  The three trial attorneys representing Universal at the hearing asked the Court to allow them to participate in the trial without disclosing to the jury the fact that they represented the insurance company.  PSMF ¶ 25; DRPSMF ¶ 25.  The Court denied Universal's request.  PSMF ¶ 26; DRPSMF ¶ 26.  Without objection, the Court allowed Universal a day to ponder over its decision to opt out of the trial and file a final determination in writing.  PSMF ¶ 27; DRPSMF ¶ 27.  The next day, Universal decided that its attorneys were not to participate in the trial.  PSMF ¶ 28; DRPSMF ¶ 28.

The trial began on November 1, 2019, and Hogar was represented by two trial attorneys.  PSMF ¶ 29; DRPSMF ¶ 29.  True to their proffer at the pretrial hearing and in motion practice, none of Universal's attorneys appeared at trial.  PSMF ¶ 30; DRPSMF ¶ 30.  Hogar's trial attorneys took part in jury selection; gave an opening statement;  posed  objections  during  direct  examination;  conducted  cross examinations; and presented closing argument.  PSMF ¶ 31; DRPSMF ¶ 31.  Ms. García-Navarro, her husband, her son, her uncle, and her religious advisor testified at trial.  PSMF ¶ 32; DRPSMF ¶ 32.  Ms. García-Navarro's experts in emergency medicine and psychiatrics also testified at trial.  PSMF ¶ 33; DRPSMF ¶ 33.  A jury

determined that Hogar had caused her damages and rendered a $950,000 damages award for Ms. García-Navarro.  PSMF ¶ 34; DRPSMF ¶ 34.  The jury issued no verdict and made no finding that any party other than Hogar was responsible for the injuries.[18]  PSMF ¶ 35; DRPSMF ¶ 35.

### G.   Ms. García-Navarro's Medical Expert, Dr. Miranda-Aponte

In the Third Pretrial Memorandum, Ms. García-Navarro announced Dr. Edwin Miranda-Aponte as an expert who will "testify in accordance with his expert reports as well as the documentation and medical literature reviewed to prepare them. He will also testify about his qualifications to serve as an expert in this case as well as about the many deviations of [sic] the applicable standard of care incurred by the co-

---

[18]     As originally drafted, PSMF ¶ 35 asserts that "[t]he jury did not find any tortfeasor other than Hogar responsible for Ms. García-Navarro's damages."

Universal denies PSMF ¶ 35 as "subject to a genuine dispute."  DRPSMF ¶ 35.  Universal says "[i]t is clear from the record that the jury was not asked to determine whether Plaintiff's damages were caused by the negligent acts of any other tortfeasor besides Hogar Bella Union," noting "[t]here is absolutely no mention on the record of any other tortfeasor."  DRPSMF ¶ 35 (citing ECF Nos. 364, 366, 367 & 368).

The November 5, 2019, jury form asked:

Do you find that plaintiff Jacqueline García-Navarro has proved it is more likely than not that she suffered damages as a result of defendants Hogar La Bella Unión's and María Betancourt's negligent acts or omissions?

*Jury Verdict Form* (ECF No. 367).  The jury responded "Yes" to find for Ms. García-Navarro, and awarded $950,000 in damages that it found were "caused by the negligence of these defendants."  *Id.*

At the damages trial, the Court cautioned the jury not to "simply award actual damages for any injury suffered by Ms. García-Navarro" but to "award actual damages only for those injuries that are a direct result of the actions by the defendants."  *Final Jury Instructions* at 12  (ECF No. 368). The Court further instructed the jury to "separate out the damages or losses attributable to those other events or injuries and award Ms. García-Navarro only those damages which you find to be caused by the defendants' fault."  *Id.* at 17.

Universal is correct that the jury was not asked to determine the liability of any other tortfeasor besides Hogar and Ms. Maria Betancourt, its principal shareholder, owner, president and administrator.  That point, however, does not refute Ms. García-Navarro's assertion in her ¶ 35.  The Court overrules Universal's objection, which goes beyond the scope of PSMF ¶ 35, but has rephrased ¶ 35 to accurately recount what the jury found, without reference to what they did not or were not asked to resolve.  *See Order on Pending Mots.* at 43 (ECF No. 427) (citing *Jury Verdict Form* at 1).

defendants.  He will testify about the causal connection between those deviations and the death of Ms. Navarro."  DSAMF ¶ 5; PRDSAMF ¶ 1.

On April 20, 2018, Dr. Miranda-Aponte rendered a Supplemental Medical Expert Report.[19]  DSAMF ¶ 6; PRDSAMF ¶ 1; DSMF ¶ 25; PRDSMF ¶ 3.  In his Supplemental Report, Dr. Miranda-Aponte stated that in his opinion:

---

[19]    Ms. García-Navarro denies DSAMF ¶¶ 6-11 and DSMF ¶¶ 25-30 "because they are supported with evidence inadmissible for summary judgment purposes."  PRDSAMF ¶ 1; PRDSMF ¶ 3.  She submits that Universal cannot rely on Dr. Miranda-Aponte's unsworn expert reports.  PRDSMF ¶¶ 1; PRDSMF ¶ 3.  She also denies Universal's facts on the grounds that they "revolve around causation issues already adjudicated by a jury" and are thus "barred by the doctrine of issue preclusion."  PRDSAMF ¶¶ 1; PRDSMF ¶¶ 3.

In reply, Universal says their six proposed "facts relate to the existence of an expert witness report that the Plaintiff retained, produced, and announced as part of their evidence in the pretrial report."  *Def.'s Reply, Universal's Response to Pl.'s Opp'n to Universal's Statement of Uncontested Facts* (DRPRDSMF) ¶ 3.  "Universal proposes these facts relying on the record of the case as this expert report had already been submitted by Plaintiff and there is no controversy regarding its existence."  DRPRDSMF ¶¶ 3.

Universal submitted these same six facts verbatim in its second motion for summary judgment, which the Court dismissed without prejudice.  *See Universal's Mot. for Partial Summ. J. as to Pl.'s and Hogar La Bella Union's Bad Faith Claims* (ECF No. 313); *Order* (ECF No. 425).  In her response, Ms. García-Navarro admitted all six facts "only to the extent that it may accurately reflect the record," otherwise denying them.  *Opp'n to Second Mot. for Summ. J. Filed by Universal Insurance* at 5 (ECF No. 316).

Federal Rule of Civil Procedure 56(c)(2) allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Generally, the existence of an expert opinion is admissible evidence that can be relied upon for summary judgment purposes.  The First Circuit has decided that at summary judgment stage "a court may take into account any material that would be admissible or usable at trial."  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993).  Expert opinions are admissible under Rule 702 of the Federal Rules of Evidence.

Previously unsworn statements may be used if they are subsequently reaffirmed under oath.  *See Miller v. Astucci U.S. Ltd.*, 2007 U.S. Dist. LEXIS 4436, at *45 (S.D.N.Y. Jan. 12, 2007) (admitting an unsworn affidavit from an expert whose "opinions were explored in detail at his sworn deposition); *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009) (holding that the district court did not abuse its discretion in considering an unsworn expert report accompanied by an affidavit at the summary judgment stage); *Maytag Corp v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) ("subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment").

On the first day of trial, on November 4, 2019, Dr. Miranda-Aponte testified as Ms. García-Navarro's expert witness regarding deviations from medical professional standards by physicians and nursing staff.  *See Min. Entry* (ECF No. 364).  The Court granted Universal's unopposed motion to exclude Dr. Miranda-Aponte's opinion as to Hogar's alleged deviations from their so-called clerical duties of record keeping and communication of information as outside the scope of his medical expertise.  *Mot. in Lim. to Limit Test. of Pl.'s Expert Witness Dr. Edwin Miranda-Aponte* (ECF No.

> "The issues whether Mrs. Navarro was a Jehovah Witness or whether a blood transfusion could be provided were completely irrelevant at that time and in no way, shape or form precluded an emergency transfer to a hospital. By failing to provide such medical treatment, Dr. García-Román acted negligently and recklessly. His actions and omissions caused Mrs. Navarro's untimely death."

DSAMF ¶ 7; PRDSAMF ¶ 2; DSMF ¶ 26; PRDSMF ¶ 3. In that report, Dr. Miranda-Aponte concludes that: "Dr. García-Román and IMF negligently and recklessly failed to adhere to the standard of care and best practice of care and best practice of medical science, when providing medical services to Mrs. Navarro." DSAMF ¶ 8; PRDSAMF ¶ 2; DSMF ¶ 27; PRDSMF ¶ 3. Furthermore, Dr. Miranda-Aponte concludes that: "It is also my expert opinion as an emergency care physician that, to a reasonable degree of medical probability, under the circumstances of this case, Dr. García-Román and IMF negligent and reckless medical care caused Mrs. Navarro's untimely and premature death." DSAMF ¶ 9; PRDSAMF ¶ 2; DSMF ¶ 28; PRDSMF ¶ 3.

On June 11, 2018, Dr. Miranda-Aponte rendered a second Supplemental Medical Expert Report II. DSAMF ¶ 10; PRDSAMF ¶ 2; DSMF ¶ 29; PRDSMF ¶ 3. In that report, Dr. Miranda-Aponte states that:

> There was enough documentation about Mrs. Navarro's medical conditions, and these conditions should have been well known by Dr. García-Román. Given Mrs. Navarro's medical history, by December 2015, Dr. García-Román needed to monitor Mrs. Navarro's hemoglobin levels. Had he done so, he would have presumably learned about Mrs. Navarro's progressive decrease in hemoglobin level and her state of malnourishment; all those symptoms were present by December 2015, as it is evident from Mrs. Navarro's medical record. Had Dr. García-

---

319); *Order* (ECF No. 328). Here, although Dr. Miranda-Aponte's report is unsworn, Ms. García-Navarro herself produced and announced it in the parties' joint pretrial order and both parties had the opportunity to question Dr. Miranda-Aponte when he testified as Ms. García-Navarro's medical expert witness at the November 2019 trial. *See Min. Entry* (ECF No. 364). The Court overrules Ms. García-Navarro's objections and admits DSMF ¶¶ 25-30 and DSAMF ¶¶ 6-11.

Román complied with his obligations as a physician, he would presumably have learned that the treatment that he prescribed for Mrs. Navarro has already been given to her by other doctors, with no positive results. As stated above, those facts existed by December 2015, as well as four days prior to Mrs. Navarro's death.

DSAMF ¶ 11; PRDSAMF ¶ 2; DSMF ¶ 30; PRDSMF ¶ 3.

### H. The MHAASA[20] Report

MHAASA is the regulatory and oversight governmental entity in charge of regulating entities that provide assisted care for the elderly with mental conditions, such as Hogar. DSMF ¶ 38; PRDSMF ¶ 1. On July 1, 2016, MHAASA issued a report titled "Recommendations and Findings of the Investigation of Complaint No: 2016-038 Hogar Bella Union." DSMF ¶ 39; PRDSMF ¶ 1. MHAASA stated in its report that Hogar had to comply with Regulation No. 8283 for its licensing and certification in order to operate a geriatric care center. DSMF ¶ 40; PRDSMF ¶ 1. MHAASA stated in its report that Hogar was licensed and certified as a Mental Health Geriatric Home. DSMF ¶ 41; PRDSMF ¶ 1. MHAASA stated in its report that all the institutions covered by Regulation No. 8283, such as Hogar, had to provide and maintain precise records of all their elderly patients who receive medical attention. DSMF ¶ 42; PRDSMF ¶ 41. MHAASA stated in its report that after conducting its investigation it concluded that Hogar had failed to keep complete patient records in violation of Regulation No. 8283. DSMF ¶ 43; PRDSMF ¶ 41. MHAASA

---

[20] MHAASA is known in Spanish under the acronym ASSMCA. MHAASA refers to the Commonwealth of Puerto Rico Mental Health and Anti-Addiction Services Administration. *See Mot. Submitting Translated English Doc.* Attach. 1, *Recommendation Regarding Findings of Investigation of Compl. No. 2016-038 Hogar La Bella Unión* (ECF No. 464). In accordance with the practice of the First Circuit, the Court refers to the English language acronym.

recommended in its report that Hogar receive an administrative fine for failing to keep a complete patient record of Ms. Navarro which caused miscommunication of information with the treating physicians.[21]  DSMF ¶ 44; PRDSMF ¶ 7.

Among other things, the MHAASA report concluded that Hogar failed to maintain a file for Ms. García-Navarro's mother.  PSMF ¶ 9; DRPSMF ¶ 9.  The report also states that personnel from Hogar incorrectly informed healthcare providers that Ms. García-Navarro's mother could not receive a blood transfusion due to her religious beliefs, even though that she had a hemoglobin level of 4.5 grams.  PSMF ¶ 10; DRPSMF ¶ 10.

The MHAASA report states that: "it is the opinion of the Office of Quality that negligence was committed both on the part of the home and on the part of the resident's primary physicians."[22]  DSAMF ¶ 13; PRDSAMF ¶ 1.  The report also

---

[21]     Ms. García-Navarro denies DSMF ¶ 44, citing "the First Circuit's anti-ferret rules."  PRDSMF ¶ 7.  She says Universal "fails to provide a pinpoint citation to the page of the [MHAASA] report where it is allegedly established that an administrative fine was levied against the Hogar because its failure to keep a complete patient record of Ms. Carlina Navarro 'caused miscommunication of information with the treating physician.'"  PRDSMF ¶ 7.  In reply, Universal argues that MHAASA, in "recommend[ing] the imposition of an administrative fine . . . clearly states that: 'We are recommending: imposition of an Administrative Fine in the amount of $500.00 per infraction of Regulation No. 8283.'"  *Reply to PRDSMF* ¶ 7 (citing MHAASA Report at 5).
        Although typically a citation to a seven-page report would be too broad, the entire report lays out the basis of the recommended fines and provides context for MHAASA's conclusion.  Accordingly, the Court rejects Ms. García-Navarro's denial on that ground.
        Ms. García-Navarro also denies DSMF ¶ 44 because the "report nowhere says what Universal Insurance has proffered about the effect that the miscommunications with the treating physician may have produced."  PRDSMF ¶ 7.  Ms. García-Navarro is correct that the record cited does not contain Universal's specific assertion regarding "miscommunications."  *See MHAASA Report*.  The Report states, in relevant part that "[i]t is the opinion of the Office of Quality that negligence was committed both on the part of the home and on the part of the resident's primary physician."  *Id.* at 4.  "The communication between the home and the physician that is providing follow up to the residents is crucial to ensure that the treatment and follow-up of their physical health takes into account their needs and that their health, live, and safety are protected."  *Id.* at 6.
[22]     Universal asserts that "[t]he report rendered by [MHAASA] does not find that Hogar's negligence was the proximate cause of Ms. García-Navarro's mother's death."  DSAMF ¶ 12.

"recommended to refer Dr. Oscar García to the Family Medicine Institute, which provided services through the Mi Salud plan to the resident CAN, to the Ethics Committee of the Puerto Rico Surgical Physicians Association, based on the findings presented."  DSAMF ¶ 14; PRDSAMF ¶ 1.

## III.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could

---

Ms. García-Navarro denies that "[MHAASA]'s investigative report and supporting documentation does not contain findings to support the conclusion that the Hogar's negligence caused the death of Jacqueline's mother."  PRDSAMF ¶ 3.   She submits that "[t]he investigative report and its supporting documentation expressly state that the reason why Jacqueline's mother was not taken to a Hospital to address her panic-level hemoglobin was that personnel from the Hogar incorrectly indicated that she was a Jehovah's Witness who could not be transfused" and "also reference the death certificate of Jacqueline's mother which states that she died due to a cardio-respiratory arrest and myocardial infarction secondary to chronic anemia."  PRDSAMF ¶ 3 (citing ECF Nos. 192-1 at 3-4 and 192-3 at 7-8).

Hogar was licensed and regulated by the Puerto Rico Government's Administration for Mental Services and Against Addiction.  *See Mot. Submitting Translated English Doc.*, Attach. 1, *ASSMCA Report* (ECF No. 464).  MHAASA performed an official administrative investigation and rendered a written investigative report concerning Ms. Navarro's death at Hogar, pursuant to Regulation Number 8283, for the Certification and Licensing of Public and Private Institutions dedicated to the Prevention, Treatment and Rehabilitation of Persons with Mental Disorders, Addiction or Substance Dependency including Alcohol, Tobacco and Employee Assistance Programs of the Administration of Mental Health and Addiction Services, Chapter V, Article 3.  *See id.*  As part of that investigation, MHAASA's personnel visited Hogar several times and interviewed its employees. *See id.*  MHAASA's personnel also visited and interviewed employees from the third-party health care provider, who provided health services to Ms. Navarro at Hogar. *Id.* In the process, MHAASA reviewed and analyzed Ms. Navarro's records with health care services providers, with hospitals and with Hogar.  *See id.*

The MHAASA report recounts that Ms. Navarro's "death certificate identifies the immediate causes of death as cardiorespiratory arrest and acute myocardial infarction. Moreover, it mentions chronic anemia as other significant causes."  *Id.* at 3.  It later states that "[f]rom [its] evaluation of the findings, it can be inferred that despite the fact that the resident was provided treatment at the home, no transfer to the hospital due to panic hemoglobin values was performed, which according to the resident's death certificate, was a secondary cause of death."  *Id.* at 4.

The Court agrees with Ms. García-Navarro that the MHAASA report does not discuss proximate cause, and referenced Ms. Navarro's cause of death based on her death certificate, not its own express findings in concluding "that Bella Union had incurred in institutional negligence in connection with Ms. Navarro's death."  The Court thus rejects DSAMF ¶ 12 as unsupported by the record cited.  The Court admits DSAMF ¶ 13, which accurately quotes the contents of the report.

resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and determine "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assur. Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of N.H. v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010) *aff'd*, 638 F.3d 6 (1st Cir. 2011). The presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Kunelius v. Town of Stow*, 588 F.3d 1, 8 (1st Cir. 2009).

## IV. THE PARTIES' POSITIONS

### A. Plaintiff's Motion for Partial Summary Judgment

#### 1. Jacqueline García-Navarro's Motion

Ms. García-Navarro seeks summary judgment on four issues. She contends that, as a matter of law:

> (i) Universal Insurance has breached the duty to defend its insured Hogar [];
>
> (ii) the settlement agreement executed between the Hogar and Jacqueline is reasonable;
>
> (iii) neither fraud, collusion or bad faith may be relied upon to invalidate the settlement agreement; and
>
> (iv) issue preclusion bars Universal Insurance from relitigating damages, causation, and liability apportionment.

*Pl.'s Mot.* at 1.

#### a. Universal's Duty to Defend

Based on the Court's previous analysis in its October 31, 2019, and November 20, 2020, Orders and the "irrefutable" facts that (1) the insurance contract at issue required Universal to defend Hogar; (2) there was "a mere possibility of coverage" when Ms. García-Navarro joined Universal as a defendant; (3) Universal never defended Hogar; and (4) Universal opted out of the trial, Ms. García-Navarro argues that the Court must find that Universal breached its duty to defend Hogar as a matter of law. *Id.* at 11-12.

### b.        The Reasonableness of the Settlement Agreement

To argue that the settlement agreement is reasonable, Ms. García-Navarro refers to the Court's prior August 12, 2021 Order. *Id.* at 13. She contends that "the dispositive inquiry" on this issue is "whether **the dollar amount** stipulated in a settlement is reasonable." *Id.* (emphasis in *Pl.'s Mot.*). Ms. García-Navarro contends that "Universal has never proffered any caselaw . . . in which a settlement agreement fails the reasonableness inquiry where, as here," the amount of damages was left for the jury to decide "after a trial in which both the insured and the insurance company" had the opportunity to defend their interests and try to minimize the damages award. *Id.* at 14. Although she maintains that "none of [the totality of the circumstances] factors apply" to her case because the settlement contained no stipulation regarding compensation, Ms. García-Navarro reasons that the settlement agreement is also reasonable under the multi-factor analysis discussed in the Court's August 12, 2021 Order. *Id.* at 15.

Addressing each of the relevant factors, Ms. García-Navarro emphasizes that her "investigation and preparation for the case far exceeded the norm," that irrefutable record evidence provides amble support for the merits of her case, that both her initial damages claim and her jury award represent significant sums, that Hogar avoided significant attorney's fees and other expenses by settling before "a full-blown trial" in this contentious case, that Hogar avoided a potentially contentious and expensive claim against Universal to establish coverage, and that Hogar "faced a real risk of an adverse judgment," which "would have threatened the Hogar's ability to remain in operation." *Id.* at 15-19.

Regarding the remaining factors, particularly both the potential comparative fault of other tortfeasors and of Ms. García-Navarro herself, Ms. García-Navarro observes that the settlement agreement did not "preclude[] Universal [] from appearing at trial, contest[ing] [Ms. García-Navarro's] evidence, and present[ing] evidence of its own to show that other tortfeasors or even [Ms. García-Navarro] had caused the damages claimed in the First Amended Complaint." *Id.* at 19.  Also, because the settlement still required her to prove her damages to the jury, the final factors regarding the damages obtained and how they were to be paid are inapplicable here. *Id.* at 19-20.

### c.   Fraud, Collusion, and Bad Faith

Ms. García-Navarro contends that Universal's affirmative defenses of fraud, collusion, and bad faith are nonexistent and inapplicable as a matter of law.  *Id.* at 20.  She argues that Universal waived these defenses with its failure to raise them in

its answer to the First Amended Complaint, and moreover it "has conducted no discovery whatsoever or made any other effort to muster evidence" to support its allegations. *Id.* In the absence of an applicable standard from the Puerto Rico Supreme Court, Ms. García-Navarro urges the Court to assess "whether the settlement agreement is concocted to artificially increase monetary recovery, while striping the insurance company of its ability to contest the underlying damages." *Id.* at 21.

After outlining Universal's opportunity to defend itself and emphasizing that Universal declined her express invitation to participate in the trial, she reasons that even if the settlement terms had intended to exclude Universal, they would have had no legal effect because "contracts only bind their signatories" and Universal is a named defendant with full rights to participate in the trial. *Id.* at 22-23. Ms. García-Navarro also insists that "the settlement did not increase [her] monetary recovery" as it was the "jury, **not the settlement agreement**, who established the monetary compensation due to her." *Id.* at 24 (emphasis in *Pl.'s Mot.*).

### d.    Issue Preclusion

Ms. García-Navarro submits that damages, causation, and liability apportionment were all litigated and decided at trial. *Id.* at 24. Noting that "the jury was expressly charged with the determination [of] whether Jaqueline suffered damages as a result of the Hogar's negligence," she asserts that, by opting out of the trial, Universal waived its right to challenge jury's finding in her favor. *Id.* at 25. Next, Ms. García-Navarro says that, as the jury also resolved liability apportionment

38

in finding Hogar the only party responsible for her injuries, Universal missed its opportunity "to minimize or even eliminate altogether the Hogar's responsibility" or to "challenge[] the existence of damages or causation." *Id.* at 26. She concludes that Universal "must now face the consequences of its decision and be precluded from trying to relitigate issues . . . already adjudicated by the jury." *Id.* at 27.

### 2.   Universal Insurance Company's Opposition

Universal opposes Ms. García-Navarro's motion on each point, arguing that: (1) it did not breach its duty to defend Hogar and, even if it had, it would only be liable for litigation costs and attorney's fees; (2) "additional undisputed facts" create sufficient doubt about the reasonableness of the settlement to defeat summary judgment as to the issue; (3) there is sufficient evidence to support its timely raised collusion defense; and (4) the issue preclusion doctrine does not bar Universal from litigating causation, damages, and liability apportionment in the upcoming trial. *Def.'s Opp'n* at 6-17.

### a.   Universal's Duty to Defend

First, Universal maintains that "it has not breached its duty to defend Hogar." *Id.* at 6. Even if Ms. García-Navarro could establish that it did, Universal says that Hogar's "only remedy under Puerto Rico substantive law would be . . . litigation costs and attorney's fees," payment of which "would render [the] issue moot." *Id.* at 6-7. Because Universal "already tendered an offer to Plaintiff to settle the Hogar Bella Union's Crossclaim for the $25,000.00 that it alleges to have spent in [Hogar's]

39

defense," Ms. García-Navarro is not entitled to summary judgment on this issue. *Id.* at 7.

###### b.     The Reasonableness of the Settlement Agreement

Universal disagrees that Ms. García-Navarro has met her burden, citing "additional undisputed facts [that] create doubt" as to whether the settlement is reasonable as a matter of law. *Id.* at 7-8. It highlights the covenant not to execute judgment against Hogar, Hogar's admission of liability, and Ms. García-Navarro's separate settlement with the co-defendant doctors. *Id.* at 8. It argues that "[b]y waiving liability apportionment" among all the joint tortfeasors, Ms. García-Navarro and Hogar "collusively attempted to . . . artificially and unlawfully increase[e] Plaintiff's potential monetary recovery by forcing Universal to be obligated to pay for the liability imposed on the released tortfeasors, who are not Universal's insured." *Id.* at 9-10. Universal says this "attempt to create coverage" is "especially unreasonable" in light of her own expert Dr. Miranda-Aponte's findings related to the released doctors' negligence. *Id.* at 10.

Turning to the merits of the settled claims, Universal says Ms. García-Navarro's reliance on the MHAASA report is misplaced because MHAASA did not establish the proximate cause of her mother's death in finding that Hogar had been negligent and failed to comply with applicable Puerto Rico regulations. *Id.* at 10-11. It submits that "Hogar [] entered into the agreement despite having strong evidence to prove that it was not liable or, at the very least, that it contributed to Plaintiff's damages in a much lower proportion than the released co-defendants" and that the

"covenant not to execute, by itself, raises a strong suspicion of unreasonableness and collusion." *Id.* at 11.

### c.    Fraud, Collusion, and Bad Faith

Universal argues that it "timely raised its collusion defense," which "only became available" upon execution and disclosure of the settlement agreement. *Id.* at 13. In response to Ms. García-Navaro's reliance on "the fact that the settlement agreement did not stipulate a monetary amount for Plaintiff's damages, and that determining damages was left to the jury," Universal says that the "'waiver of liability apportionment', coupled with the covenant not to execute and Hogar Bella Union's admission of all liability . . . artificially increases monetary recovery." *Id.* at 14-15.

### d.    Issue Preclusion

Finally, Universal submits that "the issue preclusion doctrine does not prohibit Universal from contesting causation or liability apportionment, as these issues were not 'actually litigated' in the damages only trial" nor "'determined by a valid and binding final judgment.'" *Id.* at 16 (quoting *Ramallo Bros. Printing, Inc. v. El día, Inc.*, 490 F.3d 86 (1st Cir. 2007)). According to Universal, Ms. García-Navarro conflates "causation in regards to liability in the underlying tort claim" with the "wholly separate issue [of] causation in the context of" Hogar's insurance coverage. *Id.* It reasons that to "activate Universal's duty to indemnify, Plaintiff has to prove that her damages were caused by those covered losses under the Hogar[]'s insurance policy," emphasizing that the damages trial jury was not asked to resolve that issue. *Id.* Similarly, Universal contends that it "must be given the opportunity to establish

at trial that Plaintiff's damages were caused by the negligent acts of the released tortfeasors" because it is "not contractually obligated to indemnify Plaintiff for the liability of persons who are not its insured." *Id.*

### 3.   Jacqueline García-Navarro's Reply

First, Ms. García-Navarro says Universal should have stipulated that it breached its duty to defend "long ago" and says she "will seek all applicable sanctions" upon the Court ruling in her favor on that issue. *Pl.'s Reply* at 1 n.1.  Next, she argues that the reasonableness of the settlement agreement cannot be disputed, given that: (i) the settlement agreement does not bind Universal; (ii) a jury, not the settlement agreement, determined Jacqueline's damage in a full-blown trial; and (iii) Universal had the opportunity to participate in the trial to contest her evidence on damages and present evidence of its own, but it voluntarily opted out of the proceedings. *Id.* at 3.

Ms. García-Navarro submits that "there is no published caselaw" anywhere "finding unreasonableness or collusion where, as here, a settlement agreement stipulates no monetary compensation, but rather requires that it be determined in a jury trial, in which both the insurance company and its insured may participate fully, contest all the evidence and present evidence of their own." *Id.* at 3-4.

Next, Ms. García-Navarro argues that Universal cannot relitigate damages, causation, and liability apportionment because once "adjudicated against a tortfeasor in a dual suit brought under the Direct-Action Statute, those elements need not be adjudicated again to prove coverage against the insurer." *Id.* at 4-5.  She says "the jury verdict finding the Hogar 100% liable for all the damages awarded" to Ms.

García-Navarro necessarily resolved damages, causation and liability apportionment as "elements of that verdict." *Id.* at 4 n.2.   According to Ms. García-Navarro, Universal's interpretation of *Bucci v. Essex Ins. Co.*, 393 F.3d 285 (1st Cir. 2005), to suggest that "causation and liability apportionment must be proven twice, first against the insured and then against the insurance company" would "create undue difficulties for tort victims" and undermine Puerto Rico's Direct-Action Statute.  *Id.* at 5-6.  She emphasizes that there is "no documented case in which an insurance company who voluntarily opts out of the damages prong of a jury trial under Puerto Rico's Direct-Action Statute, then musters the courage to claim that it has a right to challenge the jury determination that its insured is 100% liable for all the damages awarded." *Id.* at 4.

### B.   Universal's Motion for Partial Summary Judgment and Request for Relief from the Court's Order

#### 1.   Universal Insurance Company's Motion

Universal seeks judgment as a matter of law on Ms. García-Navarro's bad faith claims (including Hogar's assigned crossclaim) and relief from the Court's prior order on coverage.

#### a.   The Law of the Case Doctrine

Universal sets forth two reasons why the law of the case doctrine should not preclude them from relitigating their coverage decisions.  First, it contends that it is entitled to judgment as a matter of law independent from the Court's analysis of the coverage issues.  *Def.'s Mot.* at 2.  Second, Universal argues that "the law of the case

doctrine does not apply when controlling legal authority has changed since the Court's previous decision." *Id.*

i.     **Law 247 Claim and Hogar's Bad Faith Claim**

According to Universal, "since bad faith requires showing of malicious intent from the insurer, if an insurer has acted rationally with reasonable legal and/or factual justifications, it simply cannot be found to have acted in bad faith." *Id.* at 3. Thus, "[t]he question then is not whether the insurer's actions were correct under the applicable law," but rather "whether they acted reasonably in denying a claim and not from ill-intention." *Id.* It goes on to allege that "[a]t the time the bad-faith claims were filed against Universal, Plaintiff continued to litigate her claim against Hogar la Bella Union," even when her own medical expert witness stated that, even assuming that the employees at Hogar told the treating physician "that Ms. Navarro was a Jehova's Witness, Hogar [] is not liable" since that issue "was irrelevant and in no way, shape or form precluded Dr. García-Román from ordering an emergency transfer to the hospital and that Dr. García's actions and omissions caused Mrs. Navarro's untimely death." *Id.* at 4-5. It goes on to point out that Ms. García-Navarro "is seeking punitive damages under Law 247" but that Hogar's "bad faith claim . . . is sought under Puerto Rico's general tort statute." *Id.* at 5.

According to Universal, "[t]he question is not whether Universal acted correctly [in denying coverage and refusing to accept settlement offers] as a matter of law, the question is whether its actions were done reasonably and not as a product of malice." *Id.* at 11.

First, Universal contends it had "a rational basis to deny Plaintiff's settlement offers" when Ms. Garcia-Navarro's "own expert witness rendered a medical expert report stating that Hogar[]'s actions were not the proximate cause of her mother's death," which rather "was caused exclusively by Dr. García-Román's and IMF's negligent actions and/or omissions." *Id.* at 6, 15. Universal further contends that "with regards to the issue of improper record-keeping by Hogar [], Dr. Miranda-Aponte concluded that there was enough documentation about Mrs. Navarro's medical condition" and Dr. Garcia Román could have made an informed treatment decision if he had "complied with his obligations as a physician[]." *Id.* at 14. Because "the trial evidence proffered by Plaintiff demonstrates that Hogar [] is not liable for the covered events" Universal reasons that "it had no obligation to settle the case." *Id.* at 15. It concludes that, absent evidence of malicious intent or conscious wrongdoing, "since Universal had a rational basis to justify its actions denying coverage and refusing to accept Plaintiff's settlement offers within policy limits, her Law 247 bad faith action against Universal fails as a matter of law." *Id.* at 16.

Second, Universal reasons that it has a reasonable basis to believe Ms. Garcia-Navarro's claims fell "under the Designated Professional Services exclusion" based on "controlling precedent from the Puerto Rico Supreme Court . . . that the services offered by geriatric homes are professional services." *Id.* at 6-7. Recounting its argument based on *Viruet, et al., v. SLG Casiano Reyes*, 194 D.P.R. 271 (2015), in its prior motion for summary judgment in this case, Universal says "it was reasonable to think that because Plaintiff's allegations against Hogar [] stem from their failure

to render geriatric services, then they were excluded under an exclusion and a policy that had the same exact language as the one in *Viruet*." *Id.* at 13.

It also notes that "after this Court rejected Universal's position [regarding] record keeping practices and miscommunication of medical information . . . the Puerto Rico Supreme Court adopted Universal's position in *Rivera-Matos v. Triple-S*" endorsing the "intricate part doctrine." *Id.*

### ii. Rule 60(b) Relief from the Court's August 12, 2021 Order

Invoking "a well-recognized exception to the law of the case doctrine," Universal urges the Court to grant relief from its order partially denying Universal's motion for summary judgment because the Puerto Rico Supreme Court has since made a contrary decision of law applicable to the two coverage issues. *Id.* at 17. Under the "intricate part doctrine" adopted by the Puerto Rico Supreme Court in *Rivera-Matos*, Universal says the Court must evaluate "whether the alleged acts or omissions are an intricate or are otherwise related to the rendering of professional services," so as to be "excluded under the 'professional services' exclusion clause in a CGL policy." *Id.* at 22.

As argued in its prior motion to dismiss, which the Court partially denied by rejecting the "intricate part doctrine," Universal maintains "that Hogar[]'s breaches [in its failure to keep records and its miscommunication with treating the physician] . . . occurred as part of the rendering of professional services that are excluded under the terms of the CGL insurance policy." *Id.* at 23.

46

It notes that "in adopting the 'intricate part doctrine' the [Puerto Rico] Supreme Court cited as persuasive authority . . . *Alpha Therapeutic Corp. v. St. Paul Fire and Marine Ins. Co.*, 890 F.2d 368, 370-71 (11th Cir. 1989), which is the same case cited by Universal to support its position that record keeping practices and miscommunication of medical information to treating physicians, if not professional services on their own, are clerical tasks . . . intricately related to the rendering of the professional services by Hogar." *Id.* at 25.  Universal also maintains that the Puerto Rico Supreme Court's interpretation of a CGL policy with "the exact same language" should apply here. *Id.* at 25-26.  It asserts that "as a matter of substantive state law . . . geriatric homes for the elderly are healthcare institutions for the purpose of the 'Services Furnished by Health Care Professionals'" coverage exclusion, thus the breach of the "obligation to secure the wellbeing and security of the elderly patients, such as Ms. Navarro, constitutes a professional service." *Id.* at 26-27.

Following *Viruet* and *Rivera-Matos*, Universal submits that "the Court is obliged by the controlling Supreme Court precedents that expressly decided that the services provided by geriatric care centers for the elderly . . . are excluded under 'professional services' exclusions in a CGL insurance policy" and must "reevaluate its decision to reject Universal's coverage defense." *Id.* at 27.  Universal emphasizes that "[t]he fact that ASSMCA used its regulatory power to investigate and fine Hogar [] for failing to keep Ms. Navarro's records and for miscommunicating medical information to her treating physicians is further proof that these two counts are in fact professional services that are excluded from coverage." *Id.* at 29.  Universal urges

the court to grant relief from its Order and dismiss as excluded from coverage the two remaining causes for record keeping practices and miscommunication of medical information. *Id.*

### 2.   Jacqueline García-Navarro's Opposition

####   a.   Universal's "Rational Basis Defense"

According to Ms. Garcia-Navarro, Universal can only invoke a rational basis defense against tortious bad-faith claims. *Pl.'s Opp'n* at 6. Her pending Law 247 claim is statutory, and her assigned crossclaim is contractual. *Id.* Asserting that Puerto Rico's Law 247 was modeled after, and contains identical language to, Florida's bad faith statute, which demands a fact-intensive, totality of the circumstances approach, Ms. Garcia-Navarro submits that "[t]he same . . . analysis is warranted in Puerto Rico in connection with bad faith claims," as opposed to the "narrower analysis generally carried out under the rational basis defense, which only examines the insurer's justifications for a denial of coverage." *Id.* at 8-9. She goes on to assert that "Law 247 contains no language" to suggest that the rational basis defense applies, and moreover that the Puerto Rico legislature consciously chose to reject that defense when it enacted Law 247 in 2018, following Florida's lead. *Id.* at 10.

Turning to the crossclaims the Hogar assigned her, Ms. Garcia-Navarro cites *Noble v. Corporación Insular de Seguros*, 738 F.2d 51, 53 (1st Cir. 1984) and *King v. TL Dallas & Co.*, Ltd., 270 F. Supp. 2d 262 (D. PR. 2003), for the proposition that a bad faith claim for wrongful refusal of insurance coverage sounds in contract, as it

arises "from a preexisting contractual relationship between insurer and insured." *Id.* at 11-16.  She points to the First Circuit's reasoning that the "statutory obligations encompassed in the Puerto Rico Insurance Code could be deemed as incorporated implicitly into every insurance contract." *Id.* at 12.  Aside from the tort or contract nature of the bad-faith crossclaim, Ms. Garcia-Navarro submits that it demands a totality of the circumstances analysis as opposed to "the much narrower analysis used under the rational basis defense" as proposed by Universal.  *Id.* at 16.

Next, Ms. Garcia-Navarro contends that Universal's motion for summary judgment "comes laden with insurmountable evidentiary pitfalls." *Id.*  Specifically, she says Universal has not put forth any evidence regarding its decision-making process in relation to its denial of coverage and defense and refusal of settlement offers, aside from its final March 2017 letter to Hogar.  *Id.* at 17-18.  That denial of coverage letter, Ms. Garciá-Navarro says, "was predicated exclusively on the allegations contained" in her original complaint, despite the fact that Universal "was dutybound to determine whether [her subsequent] amendments trigger coverage for the Hogar." *Id.* at 18.

Next, Ms. Garcia-Navarro addresses Universal's reliance on Dr. Miranda-Aponte's expert reports.  *Id.*  After arguing that unsworn expert reports are inadmissible for summary judgment purposes, she goes on to contend that "there is no evidence in the record showing that Dr. Miranda[-Aponte]'s reports figured in any way in" Universal's decisions in this case.  *Id.* at 19.  For example, Ms. Garcia-Navarro emphasizes that "the [Universal] employee tasked to decide if coverage and

defense were to be provided, never saw Dr. Miranda[-Aponte]'s report." *Id.*  She also argues that Universal mischaracterizes the contents of the reports to argue her mother's death "was caused exclusively by Dr. García-Román's and IMF's negligent actions and/or omissions." *Id.*  According to Ms. Garcia-Navarro, Dr. Miranda-Aponte only had the expertise to opine on the conduct of the doctors involved in the case, not on the Hogar's conduct, and moreover he never said that "Hogar is free of blame from a causation standpoint." *Id.* at 19-20.  She emphasizes that "Dr. Miranda[-Aponte]'s reports are not the only causation evidence in the record," pointing the government investigation report that implicated the Hogar, and "causation is a factual determination generally left for the jury." *Id.* at 20.  Because "a jury already adjudicated causation," Ms. Garcia-Navarro asserts that "Universal Insurance's belated effort to use Dr. Miranda[-Aponte]'s reports to argue causation at this stage runs contrary to the doctrine of issue preclusion." *Id.*

Finally, Ms. Garcia-Navarro asserts that Universal's "renewed contentions under *Viruet* are barred by well-settled law" and moreover "insufficient to overcome the dictates of the law of the case doctrine." *Id.* at 20-21.  She similarly reasons that the Puerto Rico Supreme Court's subsequent decision in *Rivera-Matos* does not redeem Universal's professional services exclusion argument, noting that the *Rivera-Matos* Court shared Judge Young's concern that Universal's interpretation "would practically render the policy ineffective, since it would automatically exclude all of the works of the [insured]." *Id.* at 21-22 (quoting *Rivera-Matos*, 204 D.P.R. at 1027).

Moreover, Ms. Garcia-Navarro points out that the Puerto Rico Supreme Court decided *Rivera-Matos* years after the events underlying this case, to argue that Universal lacks any basis to say that decision "played any role in the decision-making process at the heart of this litigation." *Id.* at 22. Quoting Universal's motion for summary judgment, she reasons that "[l]ogically then, between 2017 and 2019 when the controversies at play in this case ripened, the doctrine *Rivera-Matos* allegedly adopted in 2020 was not the prevailing law." *Id.* at 22-23. She also says that Universal "fails to acknowledge that the *Rivera-Matos* holding underscores the well-settled principle that the onus to prove that an exclusion applies falls on the insurer," contending that "the record irrefutably shows that Universal" made its coverage, defense, and settlement decisions "based on a truncated analysis that failed to consider Complaint amendments as well as actual evidence showing that coverage and defense were due to the Hogar on [her] meritorious claims." *Id.* at 23.

### 3.    Universal Insurance Company's Reply

First, Universal asserts that Ms. García-Navarro, "by not putting forward any arguments to contest Universal's position on the law of the case doctrine," has conceded that *Rivera-Matos* constitutes "new controlling law" in this case. *Def.'s Reply* at 5-6. It goes on to emphasize that the *Rivera-Matos* Court "cited the same federal and common law caselaw that Universal had cited . . . in trying to convince [the Court] that the claims of record keeping practices and miscommunication of medical information to treating physicians were an intricate part of the rendering of professional services, reason for which they are excluded under the policy's

51

professional services exclusion." *Id.* at 6. It suggests Ms. García-Navarro is "misleading the Court into thinking that Universal is arguing that it denied coverage because of legal precedent that did not yet exist," when it is actually seeks Rule 60(b) relief pursuant to the law of the case doctrine in urging this Court to recognize the intricate cause doctrine as the controlling precedent applicable to the coverage issue. *Id.* at 6-7.

Turning to Ms. García-Navarro's characterization of her bad faith claims, Universal argues that any such claims, "whether derived from a breach of insurance contracts, in tort or allowed by statute, an insurer cannot be found to have acted in bad faith when it had a rational basis to justify its actions and such actions are not the product of malicious intent or conscious wrongdoing," even under her proposed totality of the circumstances test. *Id.* at 7-8. Universal goes on to insist that it has presented evidence to show that when it "denied coverage [it] did [so] based on a rational analysis of the Complaint, the insurance policy terms and the applicable Puerto Rico caselaw that had previously decided that the services provided by a Homecare Center for the elderly that provides mental and health services, such as Hogar [], are excluded under the professional services exclusion of a CGL policy with identical language as the one here in question." *Id.* at 9. It reasons it is entitled to summary judgment on the bad faith claims with this proof "that its coverage decision was not made with disregard for [the] policyholder's interest, but rather by a rational interpretation of the insurance policy exclusions." *Id.* Universal also points to its "reasonable interpretation of [the *Viruet* decision as] controlling state precedent"

as an additional rational basis for its denial of coverage pursuant to the professional services exclusion. *Id.* at 10-11. Universal maintains that "it was reasonable to think that because Plaintiff's allegations against Hogar [] stem from their failure to render geriatric services, then they were excluded under an exclusion and a policy that had the same exact language as the one in *Viruet*," particularly as the Court partially granted its prior motion for summary judgment as to some of the coverage exclusions. *Id.* at 11.

Universal goes on to argue that it continued to act reasonably after its initial coverage decision, noting that Dr. Miranda-Aponte's reports were available when it "decided not to accept Plaintiff's settlement demands, which initially w[ere] for the entire policy limits and then elevated to four times that." *Id.* According to Universal, "the evidence available at the time of settlement negotiations strongly suggested that, at a minimum, the principal tortfeasor responsible for causing Plaintiff's damages were her treating physicians who settled their cases and were completely released from liability." *Id.* at 12. Because all the parties approached settlement negotiations under the assumption that "Dr. Garcia-Roma's liability, which constituted the principal source of causation for Plaintiff's damages, would be deducted from any potential liability" for Hogar, Universal acted reasonably in refusing settlement offers, and cannot be found to have acted in bad faith. *Id.* at 12-13.

## V.   DISCUSSION

### A.   Universal's Duty to Defend

#### 1.   Breach of the Duty to Defend

First, the Court turns to whether, as a matter of law, Universal breached its duty to defend Hogar. Under the terms of Hogar's policy, Universal agreed to pay "sums that the insured becomes obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." PSMF ¶ 3; DRPSMF ¶ 3. The Universal policy provides: "We will have the right and duty to defend the insured against any 'suit' seeking those damages." PSMF ¶ 3; DRPSMF ¶ 3.

This Court has repeatedly ruled that Universal breached its duty to defend Hogar under the terms of its general commercial liability insurance policy. An insurer's duty to defend "is different from its duty to indemnify [and] 'is measured by the allegations in a plaintiff's complaint—if any of these allegations, read liberally, state facts that would be covered by a liability policy if proven true, then the insurer must provide a defense for the insured defendant.'" *Zurich Am. Ins. v. Lord Elec. Co. of P.R.*. 986 F. Supp. 2d 104, 111 (D.P.R. 2013) (quoting *Jewelers Mut. Ins. Co. v. N. Barquet, Inc.*, 410 F.3d 2, 15-16 (1st Cir. 2005)) (construing Puerto Rico law). The Supreme Court of Puerto Rico has written that the "duty to defend is ampler than the duty to compensate; it is independent from the outcome of the suit and from the imposition of liability finally made by the court." *Pagán Caraballo v. Silva, Ortiz*, 22 P.R. Offic. Trans. 96, 102, 103, 122 D.P.R. 105 (1988). Moreover, if "some of the pleadings in the complaint are covered by the policy, and others are not covered or could not be covered, the insurance company has the duty to assume the insured's defense even in those claims not covered by the policy." *Id.* Finally, the *Pagán*

*Caraballo* Court cautioned insurers like Universal that "[a]ny doubt as to whether there is a duty to defend must be solved in the insured's favor." *Id.*

Applying these precepts to the facts in this case, the Court views Universal's failure to defend Hogar - at least from the March 15, 2018 Amended Complaint - as confounding and indefensible. In his December 11, 2018 ruling on Universal's motion for summary judgment on the coverage issues, United States District Court Judge William G. Young ruled that the Universal policy did not provide coverage for the 911 call but did provide coverage for Hogar's alleged failure to maintain records and its miscommunication of the content of those records. Putting aside whether, when the lawsuit was initiated, Universal had a legitimate basis to decline to defend Hogar, Universal's failure to provide a defense to its insured after the filing of the March 15, 2018 Amended Complaint and Judge Young's December 11, 2018 ruling is problematic.

Again, regardless of the merits of Universal's arguments that Judge Young erred in finding the Universal policy provided indemnity coverage, Universal as of December 11, 2018 had obtained a judicial ruling that triggered its duty to defend Hogar and yet, Universal persisted in maintaining that it, not the judge, was correct.

Then, this Court issued an order on July 12, 2019, reaffirming Judge Young's coverage ruling. *Order on Mot. to Strike Crosscl., Mot. to File Am. Compl., and Mot. to Compliance* (ECF No. 233). In its July 12, 2019, Order, the Court allowed both Ms. García-Navarro and Hogar to amend their pleadings to assert bad faith claims against Universal. *Id.* at 28. In its order, the Court observed that "however justified

Universal's denial of coverage may have been before Judge Young's . . . coverage ruling, it has become untenable since then." *Id.* at 22.  Despite these accumulated rulings, Universal failed to provide a defense to its insured and has never recognized its duty to defend Hogar under the terms of its insurance policy.

To begin, the Court concludes that Universal's duty to defend did not arise with the filing of Ms. García-Navarro's original Complaint.  This is because the allegations in the original Complaint against Hogar and Ms. Betancourt fit within the professional services exclusion.  In Count I, the negligence count, Ms. García-Navarro contends that Hogar failed to act when Ms. Navarro-Ayala faced imminent death and specifically failed to call 911 on her behalf.  *Compl.* ¶¶ 125-28.  In Count II, the commercial liability count, Ms. García-Navarro alleged that Hogar breached its duty to keep Ms. Navarro-Ayala safe and to act whenever she needed general medical services or emergency medical care.  *Id.* ¶¶ 132-38.  In the Court's view, the original allegations, which faulted Hogar for failing to make medical assessments of Ms. Narvarro-Ayala, fit within the professional services exclusion in the Universal policy.

This changed, however, on March 15, 2018, when Ms. García-Navarro filed her First Amended Complaint.  *Am. Compl.* at 1-20 (ECF No. 72).  In paragraph 111, Ms. García-Navarro alleged that "[b]efore Mrs. Navarro[-Ayala]'s death, Mrs. Betancourt and [Hogar] personnel incorrectly informed the physicians in charge of Mrs. Navarro's healthcare that she was a practicing Jehovah Witness." *Id.* ¶ 111.  In fact, Ms. García-Navarro asserted that Ms. Navarro-Ayala was "not a practicing Jehovah Witness." *Id.* ¶ 112.  Based on this incorrect information provided by Ms. Betancourt

and Hogar's personnel, the Amended Complaint alleges that the physicians in charge "incorrectly and negligently refrained from ordering a blood transfusion to Mrs. Navarro[-Ayala]." *Id.* ¶ 113. In providing "incorrect information about Mrs. Navarro[-Ayala] to her physicians, Mrs. Betancourt and [Hogar]'s personnel negligently incurred in [sic] a clerical mistake" and they "miscommunicated basic and straightforward information" contributing to her wrongful and preventable death. *Id.* ¶¶ 114-15. This provides the context for Judge Young's determination that the professional services exclusion did not apply to Hogar's duty to maintain accurate records and its miscommunication to the treating physicians.

At the filing of the First Amended Complaint, the question was whether a "clerical mistake" fit within the professional services exclusion. The controlling case in Puerto Rico at that time was *Viruet*. In *Viruet*, the Supreme Court defined "professional services" for purposes of this exclusion:

> In the context of exclusion clauses, it has been decided that a professional service entails a vocation, calling, job or employment that further supposes some type of specialized skill, work or knowledge. Likewise, the skills required by a professional service are predominantly intellectual or mental, not physical or manual.

194 D.P.R. at 280-81. The Supreme Court wrote that the "term 'professional' forcefully implies the use of discernment, according to criteria instilled on studies or based on some specialized knowledge." *Id.* at 281. In other words, "a professional service depends on whether the person acts using inventive and special training, proper of a professional" and excludes "simply physical, manual or clerical tasks." *Id.*

In *Viruet*, the Supreme Court concluded that the nursing home's oversight of the plaintiff required "skilled care" because the plaintiff was incapacitated and had a diagnosis of Alzheimer's disease, *id.* at 285, and therefore its actions fit within the professional services exclusion.  *Id.*  Based on *Viruet*, Judge Young's determination that the professional services exclusion did not apply to Ms. García-Navarro's claim that Hogar had negligently committed its "clerical tasks" seems eminently reasonable, if not compelled by *Viruet*.

Universal's denial of its duty to defend was itself indefensible based on the allegations of the First Amended Complaint (and Ms. García-Navarro reiterated those crucial allegations against Ms. Betancourt and Hogar in all later versions of the Complaint), the controlling Supreme Court precedent of *Viruet*, and Judge Young's clear ruling that the professional services exemption did not apply to the allegations in the First Amended Complaint.  Universal's steadfast denial of its duty to defend is even more egregious because Mr. Dávila-Soto of its legal department reviewed only the original complaint and failed to review either amended complaint. "When a complaint is amended to include new allegations against an insured to whom he denied coverage and defense on behalf of Universal Insurance, Mr. Dávila-Soto has the obligation to analyze whether those new allegations trigger coverage for the insured."  PSAMF ¶ 6; DRPSAMF ¶ 6.  But "Mr. Dávila-Soto never reviewed any of the amended complaints in this case."  PSAMF ¶ 7; DRPSAMF ¶ 7.

Universal attempts to defend its denial of the duty to defend by relying on the August 24, 2020 Supreme Court case of *Rivera-Matos*.  The Court will address *Rivera-*

*Matos* in further detail in its discussion of whether Universal owes the duty to indemnify Hogar.  However, the Court concludes that Universal may not use *Rivera-Matos*, a case decided in August 2020, to deny its duty to defend in March 2018.  An insured has the right to a defense under an insurance policy based on the law as it exists as of the date of the filing of the complaint (or in this case Amended Complaint), not based on the law as it thinks it should be or on developments in the law sometime thereafter.  As of 2017, the Supreme Court of Puerto Rico had expressly written that "clerical tasks," as alleged in the Amended Complaint, were not included within the ambit of professional services.  *Viruet*, 194 D.P.R. at 281.

Moreover, the timing of *Rivera-Matos* is problematical for Universal, given the facts in this case.  Ms. García-Navarro filed her Complaint on February 23, 2017, when *Viruet* was the last word from the Supreme Court of Puerto Rico on the professional services exclusion.  In fact, in its reply to Ms. García-Navarro's response to its 2018 motion for summary judgment, Universal conceded that *Viruet* "now controls the issue here at hand as a matter of substantive law."  *Reply to Pl.'s Resp. in Opp'n to Mot. for Summ. J. Filed by Universal Ins. Co.* at 3 (ECF No. 141).  On October 26, 2019, Ms. García-Navarro and Hogar entered into a settlement agreement in which Hogar assigned its rights against Universal.  *Informative Mot. Regarding Settlement and Urgent Req. for Order* at 1 (ECF No. 331); *Mot. Req. Dismissal of Direct Cause of Action Against Universal Ins. on Ground of Collusion Between Claimant and Insured or, in the Alternative, Req. for Recons. of Order at Docket No. 332*, Attach. 1, *Confidential Settlement Agreement and Covenant Not to*

*Sue* (ECF No. 349).  Once Ms. García-Navarro and Hogar entered into this settlement agreement on October 26, 2019, in which Hogar assigned its rights against Universal to Ms. García-Navarro, and once the jury fixed the damages against Hogar on November 5, 2019, Hogar was effectively removed from the case and it is questionable whether under any theory Universal had a continued duty to defend Hogar after then. Thus, since Universal's duty to defend was triggered on March 15, 2018, when Ms. García-Navarro filed her First Amended Complaint, and effectively ended around November 5, 2019, during which interval *Viruet* was the only Supreme Court pronouncement, the Court is doubtful whether Universal may resort to a case decided on August 24, 2020 to justify its past denials.

Finally, if Universal could use *Rivera-Matos* to defend its denial of its duty to defend before the Supreme Court decided *Rivera-Matos*, the Court would still conclude that Universal owed a duty to defend under *Rivera-Matos*.  In *Rivera-Matos*, the Supreme Court discussed *Estate of Tinervin v. Nationwide Mutual Ins. Co.*, 23 So. 3d 1232 (Fla. 4th DCA 2009), which addressed a similar issue.[23]  *Rivera-Matos*, 204 D.P.R. at 1023 (discussing *Tinervin*).  In *Tinervin*, the Court of Appeals for the state of Florida concluded, based on the facts in that case, that the insurer owed a duty to defend but no obligation to indemnify its insured.  23 So. 3d at 1238.  Thus, applying the caselaw the Supreme Court cited with apparent approval in *Rivera-*

---

[23]    The *Rivera-Matos* Court cited *Duncanville Diagnostic Center v. Atlantic Lloyd's Insurance Co.*, 875 S.W.2d 788 (Tex. App. 1994), where the court concluded there was no duty to defend a malpractice lawsuit based on the professional services exclusion.  However, *Duncanville* is factually dissimilar because the allegation of malpractice involved the administration of drugs, providing medical advice, and making a medical diagnosis.  *Id.* at 791.

*Matos*, the lesson would be that an insurer like Universal owes a duty to defend, even if it may not owe the duty to indemnify when the complaint alleges that a clerical act caused injury.[24]

The Supreme Court of Puerto Rico has described the purposes of an insurer's duty to defend and the consequences of an insurer's breach of the duty. *Pfz Prop. V. Gen. Accident Ins. Co.*, 136 D.P.R. 881, ¶¶ 1-3 (P.R. 1994). The duty to defend is "an essential part of the coverage contracted with the insurance company." *Id.* ¶ 1. The duty to defend has two purposes: "to create an obligation on the part of the insurer to defend the insured in any claim for damages, and to afford the insurer certain rights in regard to [exercising control over] the defense of said insured." *Id.* ¶ 2. Furthermore, when an insured gives its insurer prompt notice of a claim, the insurer "is placed in a position to take steps to launch an investigation, to negotiate a possible settlement, or to make the necessary arrangements to prepare for the defense of the insured." *Id.* ¶ 3. Under Puerto Rico law, when an insurer breaches its insurance contract and violates its duty to defend, the insured "is entitled to costs and attorneys fees." *Zurich Am.*, 986 F. Supp. 2d at 115 (quoting *Municipality of San Juan v. Great Am. Ins. Co.*, 813 F.2d 520, 521 (1st Cir. 1987)).

---

[24]     The Supreme Court cited *Atlantic Lloyd's Insurance Co. v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472 (Tex. App. 1998), where the Texas Court of Appeals concluded that an insurer did have a duty to defend a lawsuit despite the professional services exclusion. *Rivera-Matos*, 204 D.P.R. at 1023-24. *But see Bohreer v. Erie Ins. Grp.*, 475 F. Supp. 2d 578, 586 (E.D. Va. 2007) (no duty to defend when the plaintiff alleged that a funeral home had mishandled the remains of a decedent and improperly cremated the remains); *Assurance Co. of Am. v. Am. Registry of Radiologic Technologists*, 64 F. Supp. 3d 1289 (D. Minn. 2014) (allegations against a radiological technician within the professional services exclusion).

61

Faced with a similar breach, in 2013, a district court ordered that the insured was entitled to "a declaration that [the insurer] violated its duty to defend it in the underlying action" and that in so doing, the insurer "breached its contractual obligations." *Zurich Am.*, 986 F. Supp. 2d at 115. Following this example, this Court GRANTS in part Jacqueline García-Navarro's Motion for Partial Summary Judgment (ECF No. 450) and rules that Universal Insurance Company violated its duty to defend Hogar La Bella Unión, Inc. and Maria M. Betancourt and thereby breached its insurance contract with Hogar La Bella Unión, Inc. and Ms. Betancourt.

### 2. Consequences of Universal's Breach of the Duty to Defend

Under Puerto Rico law, when an insurer breaches its insurance contract and violates its duty to defend, the insured "is entitled to costs and attorneys fees." *Zurich Am.*, 986 F. Supp. 2d at 115 (quoting *Great Am. Ins.*, 813 F.2d at 521). In its opposition to Ms. García-Navarro's motion for partial summary judgment, citing *Pagan Caraballo*, Universal concedes that Hogar's remedy for breach of the duty to defend is for the Court "to impose litigation costs and attorney's fees." *Def.'s Opp'n* at 6. It then writes:

> Thus, payment of these costs and attorney's fees would render this issue moot. Universal has already tendered an offer to Plaintiff to settle the Hogar[]'s Crossclaim for the $25,000 it alleges to have spent in its defense. **See Docket No. 433.** For these reasons, summary judgment should be denied.

*Id.* at 7. Universal's citation to docket number 433 is to its January 15, 2021 filing in which it made the same statement:

> Before entering into the Settlement Agreement with Plaintiff, Hogar [] proffered evidence in the pretrial report, that has not been admitted into

> evidence, where she stated that the amount spent on its defense was
> $25,000.00.   Universal has tendered an offer to Plaintiff to settle the
> assigned Crossclaim for said $25,000.

*Universal Ins.' Mem. of Law in Compliance with Order at Docket No. 430* at 16 (ECF

No. 433).  No citation follows Universal's assertion and the Court is unclear when and

where Hogar made this assertion.   Nevertheless, Universal's past offer to settle

defense costs with Hogar is neither here nor there.

Unfortunately, the Court is unable to resolve this issue because the amount of

defense and litigation costs incurred by Hogar from the filing of the First Amended

Complaint through whenever Hogar's attorneys as a practical matter were no longer

representing Hogar[25] is not a matter of record.   Accordingly, the Court sets a

timeframe for Ms. García-Navarro to submit evidence of Hogar's litigation costs and

attorney's fees and for Universal to respond.   Once the Court has this additional

information, it will issue an order fixing the amount of litigation costs and attorney's

fees owed from Universal to Ms. García-Navarro as assignee of Hogar.   The Court

ORDERS Jaqueline García-Navarro to file evidence of the attorney's fees and

litigation costs incurred by Hogar within fourteen days of the date of this order and

ORDERS Universal Insurance Company to file any objections to the amount of the

requested attorney's fees and litigation costs within two weeks of the date of Ms.

García-Navarro's filing.

### B.    The Reasonableness of the Settlement Agreement

---

[25]    Attorneys Jose L. Escalera-Canales and Ramon M. Gonzalez-Santiago remain listed as counsel for Hogar and Ms. Betancourt.

The Court turns to whether the Plaintiff has met her burden of establishing the reasonableness of her settlement agreement with Hogar. Ms. García-Navarro urges the Court to deem the settlement reasonable because: (1) it did not stipulate a specific monetary amount; (2) her damages were determined by a jury; and (3) both Universal and Hogar had the ability to contest damages in the damages trial. Given her investigation and preparation of the case, the merits of her case, the amount of damages claimed, the merits of the insured's defense, she submits it is reasonable under the totality of the circumstances test.

### 1. The Legal Standard

In its August 12, 2021 Order, after extensive analysis, the Court concluded that "the Supreme Court of Puerto Rico would likely adopt the majority approach and place a prima facie burden on Ms. García-Navarro to show her settlement agreement with Hogar was reasonable," under the totality of the circumstances, and entered into in good faith. *Order on Collusion and the Duty to Defend* at 25 (ECF No. 438).[26] Under this framework, the Court must "must determine what a reasonably prudent party in the insured's position would have settled for after considering the merits of the plaintiff's case, claimed damages, and the possibility of an adverse verdict." *Id.* at 22. Relevant factors include "the damages the plaintiff obtained through the judgment, the merits of the plaintiff's theory of liability, and the merits of the insured's defenses," as well as the insured's relative fault, ability to pay, risks and

---

[26]    For a more extensive analysis of this conclusion, the Court refers to its August 12, 2021 order. *See Order on Collusion and the Duty to Defend* at 1-27 (ECF No. 438).

expenses of continued litigation, and the extent of the plaintiff's investigation and preparation for the case. *Id.* at 22-23.

The Court further concluded that if Ms. García-Navarro can make her initial showing, the burden shifts to Universal to prove by a preponderance of the evidence that the settlement was unreasonable. *See id.* at 26 (reasoning that "if presented with the question, the Supreme Court of Puerto Rico would conclude insurers who breach their duties to defend are only liable for reasonable settlement agreements between their insureds and claimants").

### 2.    The Settlement is Reasonable Under the Totality Test

The Court concludes that Ms. García-Navarro has met her prima facie burden to demonstrate that her settlement agreement with Hogar was reasonable.  The summary judgment record details Ms. García-Navarro's preparation for trial, including obtaining the MHAASA report confirming Hogar's violations and related fines and the contradictory text messages from Ms. Betancourt, and then presenting related witnesses at trial as well as numerous expert witnesses. *See* PSMF ¶¶ 12-18; DRPSMF ¶¶ 12-18.  Hogar fought to keep the MHAASA report out at trial because a jury could conclude that Hogar's violations and negligence caused Ms. Navarro's death.  PSMF ¶ 21; DRPSMF ¶ 21.  Hogar's thin profit margin limited its ability to keep up with litigation expenses, not to mention its overall ability to pay a potential adverse judgment.  PSMF ¶ 21; DRPSMF ¶ 21.

Hogar's trial counsel declared that he explained to his client his assessment that Ms. García-Navarro's case presented "a real risk of an adverse judgment," which

could have pushed Hogar into bankruptcy and threatened its operating license. PSMF ¶ 21; DRPSMF ¶ 21.  Although the Court disagrees with Ms. García-Navarro that the fact that the parties left the damages unspecified does not by itself render the settlement reasonable, the summary judgment record supports the merits of her underlying case and the assertion that Hogar faced serious trial risks.  The summary judgment record indicates that Ms. García-Navarro had a worthy case for significant potential damages.

Moreover, Universal's criticism of Hogar's counsel's decisions must be seen in the broader context of Universal's breach of its duty to defend Hogar.  If Universal had recognized its duty to defend, it, not Hogar, would have enjoyed "certain rights in regard to [exercising control over] the defense of said insured."  *Pfz Prop.*, 136 D.P.R. 881, ¶ 2.  Indeed, the Universal policy describes its duty to defend as both a right and a duty.  *Universal Ins. Policy* at 19 ("We will have the right and duty to defend the insured against any 'suit' seeking those damages").  Typically, when an insurer breaches its duty to defend an insured, it waives its right to control the defense.  *Episcopal Church in S. Carolina v. Church Ins. Co. of Vermont*, 53 F. Supp. 3d 816, 824 (D.S.C. 2014) ("[I]t seems that the majority of jurisdictions . . . have concluded that once the insurer unjustifiably refuses to defend its insured, the insurer loses its right to control the defense and select defense counsel").  Here, Universal is complaining about the judgments that Hogar's counsel made in defending a case that Universal itself could have and should have defended.

Universal stresses the comparative fault of the co-defendant doctors.  Under Puerto Rico law, a jury may be asked to apportion liability among joint tortfeasors and in certain situations, a plaintiff is limited to the percentage of responsibility of its contribution to the overall damages.  *See Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 D.P.R. 484 (2009); *Szendrey v. Hospicare, Inc.*, 158 D.P.R. 648 (2003). Nevertheless, the Court concludes that, on balance, the single factor of the doctors' negligence and causal role in Ms. Navarro's death does not undermine Ms. García-Navarro's prima facie showing of reasonableness.  Universal could have accepted the invitation to make its comparative fault arguments before the jury; instead, it declined to participate.  Moreover, at the time of the settlement, no one knew what the jury verdict would be, which means that the jury verdict could have been far below the amount that a setoff for the other settlements would have dictated.

### C.    Fraud, Collusion, and Bad Faith

The burden now shifts to Universal to prove by a preponderance of the evidence that the settlement is unreasonable.  The Court specifically considers whether the settlement agreement is invalid for fraud, collusion, or bad faith.

Universal maintains that the settlement improperly enabled a double-recovery for Ms. García-Navarro, and that the apportionment waiver represents a collusive attempt to create coverage.  In its November 30, 2020, Order, the Court rejected the double-recovery challenge, explaining that:

> the Settlement Agreement does not permit double recovery and is therefore valid under Puerto Rico law.  Here, the jury issued no verdict and made no finding that any party other than Hogar La Bella Unión was responsible for the injuries.  *Jury Verdict Form* at 1.  Consistent

with the jury verdict, the Settlement Agreement merely admits Hogar La Bella Unión was completely liable for the Plaintiff's injuries. Without a jury finding that another party was at fault for a percentage of the damages, the Court would err by finding double-recovery present here. As the caselaw demonstrates, the fact that the Plaintiff previously settled with the other joint tortfeasors does not somehow transform the jury award into an impermissible double recovery. Rather, because the jury award against Hogar La Bella Unión apportioned no fault to other parties, that recovery was singular and legally unaffected by the Plaintiff's other settlements. Therefore, public policy against double recovery does not invalidate the Settlement Agreement.

*Order on Pending Mots.* at 43-44 (ECF No. 427) (*November 30, 2020 Order*).

The Court went on to conclude that:

in Puerto Rico, the trier-of-fact apportions liability among joint tortfeasors. Each joint tortfeasor is fully liable for the plaintiff's undivided injury. However, if a tortfeasor pays more than his apportioned share, he may seek contribution from the other joint tortfeasors. Settlement complicates this matter slightly. A settling tortfeasor is released from its internal and external liability. Therefore, it is owed no contribution and owes no contribution. In an action against a non-settling tortfeasor, a jury may apportion fault between both the settling and non-settling tortfeasors. However, because the settling party no longer has a duty of contribution, apportionment will merely reduce the overall judgment against the non-settling party by the percentage fault of settling parties.

*Id.* at 68.

Universal also argues that Hogar signed the settlement despite knowing it was not liable. Even though the parties left the determination of damages for the jury, Universal submits that Hogar's admission of liability, together with the covenant not to execute and the apportionment waiver, worked to artificially increase Ms. García-Navarro's recovery.

As to the potential of collusion in settlements, "courts are virtually all in agreement that, as a starting point, when an insured and tort claimant enter into an

agreed judgment accompanied by a covenant not to execute the judgment, that judgment can be enforceable if coverage exists." *Ayers v. C&D Gen. Contractors*, 269 F. Supp. 2d 911, 915 (W.D. Ky. 2003) (citing *Franco v. Selective Ins. Co.*, 184 F.3d 4 (1st Cir. 1999) (noting that a review of the relevant case law shows that covenants not to execute have not been found to automatically preclude indemnification claims)). It is true that where settlements contain covenants not to execute, the insured may be persuaded to settle for an inflated amount in exchange for immunity from personal liability. Still, by "raising the coverage defense even in good faith, the insurer places the insured in a position where settlement may be necessary for his own protection rather from lack of cooperation with the insurer." *United States Automobile Ass'n v. Morris*, 741 P.2d 246, 252 (Ariz. 1987) (considering a case involving a consent judgment and a covenant not to execute).

The Court cannot infer bad faith, collusion, or fraud based on innuendo and speculation alone. Here, the evidence shows that the settlement was the result of extensive negotiations. *See Ayers*, 269 F. Supp. 2d at 917 (evidence that settlement amount is reasonable supports finding that it was negotiated at arm's length). The Court accepts the proposition that there was a potential for a devastating judgment against Hogar, risking its operating license and bankruptcy. The Court also considered Ms. García-Navarro's claimed damages and liability theory, the risk and expenses of continued litigation, requiring various medical experts, investigative reports, and witnesses, and Hogar's relative fault. Universal insists that Hogar

should never have admitted liability given the role of the released doctors, and the settling parties' knowledge of the doctors' causal role in Ms. Navarro's death.

But, even if MHAASA and Dr. Miranda-Aponte found the doctors' breached their duty of care, their conclusion does not eliminate potential liability on Hogar's part, and in fact, Hogar's negligence and miscommunication remained viable contributing causes of Ms. Navarro's pain and suffering and ultimate death. The fact that Hogar may not have been the sole cause of Ms. Navarro's death does not render unreasonable its decision to settle, to acknowledge liability, to avoid exposure beyond the available insurance limits, and to otherwise protect itself from an adverse verdict.

Moreover, if Universal considered the doctors to be the more liable parties, it had the opportunity to press that argument at trial, and to fix a percentage of responsibility for damages on the settling defendants. For reasons of its own, Universal declined to participate at trial. *Notice of Universal Ins.'s Position and Non-Participation as to the Damages Only Trial that is Scheduled to Start on Nov. 4, 2019* (ECF No. 355).

Courts have "express[ed] concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties." *Glenn v. Fleming*, 247 Kan. 296, 317-18, 799 P.2d 79, 92 (1990) (citing cases in which prejudgment covenants not to execute have been approved). In such cases, "the settlement between the plaintiff and the insured may not represent an arm's length determination of the value of the plaintiff's claim." *Id.* at 318. Assessing "the primary argument against permitting

the use of covenants not to execute," namely "that their use will impart a collusive character to a personal injury suit," the Kansas Supreme Court observed that it "would be highly unusual for fraud or collusion to taint the amount of the judgment when . . . the assignment/covenant is executed after a jury verdict."  *Id.* at 317-18 (concluding that an amount awarded by the jury, as opposed to one set by the parties, "may be assumed to be realistic").

Universal grounds its bad faith, fraud, and collusion arguments on the settlement's admission of liability, waiver of apportionment, and covenant not to execute provisions without demonstrating why those provisions render the settlement void.  Where Universal's own evidence supports rather than rules out Hogar's potential liability, it fails to meet its burden once Ms. García-Navarro demonstrated prima facie reasonableness.  Here the parties executed the settlement before trial, not after, but the fact that Ms. García-Navarro still had to make her case for damages to the jury undercuts Universal's fraud and collusion challenge, particularly in light of Universal's breach of the duty to defend.

Here, the Court concludes that Universal failed to establish that the settlement was intended to, or in fact did, artificially increase Ms. García-Navarro's recovery, and has failed to rebut her evidence that the settlement was reasonable and made in good faith.

### D.   Issue Preclusion

The Court turns to whether issue preclusion bars Universal from relitigating damages, causation, and liability apportionment.  Under Puerto Rico's Civil Code:

> In order that the presumption of res adjudicata may be valid in another suit, it is necessary that, between the case decided by the sentence and that in which the same is invoked, there be the most perfect identity between the things, causes, and persons of the litigants, and their capacity as such.

P.R. LAWS ANN. tit. 31, § 3343.  "The statute covers both claim and issue preclusion." *Díaz-Báez v. Alicea-Vasallo*, 22 F.4th 11, 20 (1st Cir. 2021).

"Despite 'the rather strict wording of Puerto Rico's mutuality requirement,' the inclusion of new parties in a case 'is not a bar to the application of [issue preclusion].'" *Id.* (citing *Sánchez-Núñez v. P.R. Elec. Power Auth.*, 509 F. Supp. 2d 137, 146 (D.P.R. 2007) (alteration in *Díaz-Báez*).  "Nor is perfect identity of causes required when the defense is one of issue preclusion, rather than claim preclusion."  *Id.* (citations and quotation marks omitted).  Rather, issue preclusion "forecloses relitigation in a[ny] subsequent action of a fact essential for rendering a judgment in a prior action between [primarily] the same parties, even when different causes of action are involved." *Cruz Berríos v. Gonzalez-Rosario*, 630 F.3d 7, 12 (1st Cir. 2010) (quotations and citation omitted).  "Courts apply this doctrine to reduce litigation expenses, conserve judicial resources, and cultivate reliance on judicial decisions by avoiding inconsistent conclusions." *Díaz-Báez*, 22 F.4th at 20.

Ms. García-Navarro bears the burden of proof in her effort to give offensive collateral estoppel-like effect to the Settlement Agreement's admission of negligence and subsequent jury damages verdict.  *See Puerto Ricans for P.R. Party v. Dalmau*, 544 F.3d 58, 70 (1st Cir. 2008) ("Once properly raised, a party asserting preclusion must carry the burden of establishing all necessary elements").  The Court concludes

that Universal is not barred by issue preclusion in challenging Hogar's negligence and its duty to indemnify at trial.  The Court leaves for the factfinder the task of interpreting the terms of Hogar's policy and defining the scope of Universal's duty to indemnify.  At trial, Universal may raise its relevant defense to coverage and contest Hogar's negligence, subject to the limits of res judicata and collateral estoppel.  *See November 30, 2020* Order at 55.

"Puerto Rico's direct action statute, 26 L.P.R.A. §§ 2001, 2003, permits an injured party to bring an action directly against the insurer." *Gonzalez v. Cruz*, 926 F.2d 1, 2 n.3 (1st Cir. 1991).  "The statute creates a separate cause of action which is not dependent on prior payment by the insured or final judgment being rendered against her." *Id.* (citing *Fraticelli v. St. Paul Fire & Marine Ins.*, 375 F.2d 186, 188 (1st Cir. 1967)).  "[A]n insurer's liability is not absolute under the direct action statute, rather, it only becomes liable when a loss covered by the pertinent insurance policy occurs" and "does not depend upon payment by the insured." *Gold v. Nat'l Union Fire Ins. Co.*, No. 10-2211 (ADC), 2014 U.S. Dist. LEXIS 205148, at *16 (D.P.R. Mar. 31, 2014).

Thus, Universal's liability turns on whether a loss covered by Hogar's policy occurred.  *See* P.R. Laws Ann. tit. 26, § 2001.  The Puerto Rico Supreme Court has explained that "the liability of the insurer is contingent upon the liability of the assured" and "therefore, a complaint against the insurer alone, before obtaining a final and unappealable judgment against the insured, does not adduce a cause of

action." *José Agustín Guerra v. Eulogio Ortiz & Royal Indem. Co.*, 71 P.R. Dec. 613, 613 (1950).

The Court concludes that after Universal opted out of trial, it cannot now challenge Hogar's damage award as actually litigated and resolved by the jury. However, the Court concludes that Ms. García-Navarro cannot prevent Universal from litigating issues relating to its duty to indemnify. In awarding damages, the jury was not asked to resolve issues of causation and relative liability between Hogar and the doctors. Because Universal's duty to indemnify (which is specific to the liability of its insured) turns on issues that were not actually litigated or determined by a valid and binding final judgment, it remains to be determined whether Ms. García-Navarro's damages were caused by covered losses.

### E.   Law of the Case & Coverage Exclusions

On August 15, 2018, Universal raised its coverage defense in a motion for summary judgment. *Mot. for Summ. J.* (ECF No. 111). Judge Young issued the following ruling:

> Here's the order of the court. Universal's motion for partial summary judgment is allowed insofar as it related to any allegations arising out of a failure to call 911, and it's denied as it relates to the failure to keep records of personal information, um, on file and insofar as it relates to miscommunicating to the treating physician about the blood transfusion. Those allegations are not professional services and, um, the case will go forward as to those against the facility.

*Min. Entry* (ECF No. 166) at 10:18-11:1. Applying the Puerto Rico Supreme Court's *Viruet* decision, Judge Young distinguished between Hogar's decision not to call 911

and staff recordkeeping and communications, in ruling that Universal provided coverage for some but not all the allegations in the Second Amended Complaint.[27]

Universal's policy exclusion defense has been previously presented and rejected. Generally, under the law of the case doctrine, "a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation." *Ellis v. United States*, 313 F.3d 636, 646 (1st Cir. 2002) (citation omitted). A court must generally "respect and follow its own rulings, made earlier in the same case." *Id.*

As the First Circuit has observed:

[L]aw of the case serves important interests, such as stability in the decisionmaking process, predictability of results, proper working relationships between trial and appellate courts, and judicial economy. Courts should therefore be loathe to disturb prior decisions in a case. Nevertheless, courts may reopen a matter previously decided on a showing of exceptional circumstances — a threshold which, in turn, demands that the proponent accomplish one of three things: show that controlling legal authority has changed dramatically; proffer significant new evidence, not earlier obtainable in the exercise of due diligence; or convince the court that a blatant error in the prior decision will, if uncorrected, result in a serious injustice.

*Negrón-Almeda v. Santiago*, 579 F.3d 45, 51-52 (1st Cir. 2009) (citations and internal quotation marks omitted). The standard for reviewing a prior decision is properly strict. In *Harlow v. Children's Hospital*, 432 F.3d 50 (1st Cir. 2005), the First Circuit wrote that "[u]nder the law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is

---

[27] Here, the Court does not discuss Universal's refusal to live up to its obligation to defend Hogar, a duty the Court determined that Universal breached, regardless of the impact of the law of the case doctrine.

clearly erroneous and would work a manifest injustice." *Id.* at 55 (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).   Universal argues that the Puerto Rico Supreme Court's decision in *Rivera-Matos* constitutes a dramatic change in the controlling law such that the Court must revisit Judge Young's ruling on the policy exclusion and its own prior assessments of coverage issues in this case.

The Court agrees with Universal that the Puerto Rico Supreme Court's decision in *Rivera-Matos* compels a reexamination of whether Judge Young's analysis based only on *Viruet*, is still correct in light of *Rivera-Matos*.   Under *Viruet*, the test was whether "a professional service entails a vocation, call, occupation or employment that also implies some type of knowledge, work or specialized skill."  194 D.P.R. at 280.  The *Viruet* Court went on to say that the "skills required for professional service are predominantly intellectual or mental, not physical or manual."  *Id.* at 280-81. Significantly, the Supreme Court wrote that "activities that involve simply . . . clerical tasks are excluded." *Id.* at 281.  Based on this clear guidance, Judge Young properly ruled that the clerical tasks of denoting a resident's religion and communicating with the contracting physicians fell outside the range of professional services.

Although its impact on the facts in this case is debatable, the Court concludes that the Court is not bound by the law of the case in assessing whether the professional services exclusion still applies after *Rivera-Matos*.  In *Rivera-Matos*, the Supreme Court determined that the provision of janitorial services in that case constituted professional services and that the "actions or omissions of the cleaning staff constitute an integral and necessary part of the professional service contracted."

76

204 D.P.R. at 1030.  Specifically in reference to this case, the Supreme Court cited *Tinervin*, *supra*, and *Alpha Therapeutic*, 890 F.2d 368, where courts had found that merely clerical activities could be excluded under the professional services exclusion. As *Rivera-Matos* significantly altered the way a court would approach the professional services exclusion, the Court concludes that "controlling legal authority has changed dramatically," *Negrón-Almeda*, 579 F.3d at 51-52, and that the Court should take a fresh look at the professional services exclusion in light of *Rivera-Matos*.

## F.  Indemnity Coverage and the Professional Services Exclusion

As the Court has indicated, if *Viruet* were the last word from the Supreme Court of Puerto Rico, the Court would readily conclude that Universal owed not only a duty to defend, but also a duty to indemnify its insured Hogar from the claims in Ms. García-Navarro's lawsuit.  However, in *Rivera-Matos*, the Supreme Court adopted a different analytic framework to determine whether the professional services exclusion applies.

### 1.  *Rivera-Matos*

On August 24, 2020, the Supreme Court of Puerto Rico again addressed the professional services exclusion.  *Rivera-Matos*, 204 D.P.R. 1010.  The facts in *Rivera-Matos*, however, are distinct from the instant case.  In *Rivera-Matos*, the insured of a comprehensive general liability policy was a janitorial service, which advertised itself as a specialized company engaged in the cleaning of healthcare facilities and providing specialized personnel that complied with industry standards.  *Id.* 204

D.P.R. at, 5.  The *Rivera-Matos* plaintiffs' complaint alleged that the janitorial service failed to properly clean a hospital, resulting in an infection that caused the deaths of sixty-three patients.  *Id.* at 3.

In *Rivera-Matos*, the Supreme Court elaborated on *Viruet*.  The Supreme Court noted that the professional services exclusion includes "acts, even though they do not require specialized knowledge, to which this exclusion applies for being an intricate part of professional services rendering process."  *Id.* at 13-14.  In evaluating this exclusion, the *Rivera-Matos* Court focused first on the "**nature of the imputed conduct**" to determine "whether these are an intricate part or are otherwise related to the rendering of professional services.  *Id.* at 20 (emphasis in original).  Reviewing the allegations in the complaint in *Rivera-Matos*, the Supreme Court found it especially significant that the plaintiffs had not alleged "isolated negligent acts or events, which are independent of one another, but with systemic conduct, incompatible with the **general obligation of rendering specialized janitorial services to the Hospital**."  *Id.* at 23-24 (emphasis in original).  The Supreme Court concluded that "in this case, the liability attributed to North Janitorial arises out of the alleged relinquishment of the responsibility contracted with its client of providing **specialized janitorial services** in the Hospital's facilities and not of the janitorial staff's specific acts or ordinary services."  *Id.* at 24 (emphasis in original).  In this context, the *Rivera-Matos* Court wrote, "the acts or omissions of the janitorial staff constitute an intricate and necessary part of the contracted professional service, and

cannot be separated from the responsibility assumed by North Janitorial as the insured suggests." *Id.*

### 2.     Other Cited Authority

The *Rivera-Matos* Court discussed six cases from other jurisdictions, where court have found that "actions that, although they do not require specialized knowledge, because the constitute an integral part of the process of providing professional services, apply this exclusion to them." *Id.* at 1023. Each of these cases, however, raises distinct questions.

In *Tinervin*, the Florida Court of Appeals addressed a situation where the physician's wife, who was employed with the medical practice, failed to file a vital lab report in the patient's chart and thereby caused the physician not to change his treatment plan and resulted in the death of the patient. 23 So. 3d at 1234. The *Tinervin* Court concluded that the physician's wife was performing services that were an "intricate part" of the medical services provided by the doctor. 23 So. 3d at 1237. Even though the medical practice argued that the wife was not a medical professional, the evidence revealed that she had not only "performed clerical tasks, but she took vital signs: temperature, pulse, height, blood pressure, and weight." *Id.* at 1238. Accordingly, the Florida Court of Appeals concluded that she fit within the Florida statutory definition of "medical assistant." *Id.* at 1237-38.

In *Duncanville*, the Texas Court of Appeals dealt with the professional services exclusion in a case where two radiological technicians injected an improperly measured dose of chloral hydrate, a sedative, into a four-and-one-half year-old girl,

who became unconscious and later died from acute chloral hydrate intoxication. 875 S.W.2d at 790. The *Duncanville* Court readily found that the professional services exclusion applied because the measuring and documenting of drug dosages were not administrative or ministerial tasks and, to the extent they could be deemed as such, the acts "were nonetheless an intricate part of the professional medical services provided by the Center." *Id.* at 791.

In *Alpha Therapeutic*, Alpha Therapeutic entered into a contract in which Hunter Blood Center agreed to sell Alpha its entire production of human plasma. 890 F.2d at 368-69. Hunter agreed to test the plasma for the presence of an antigen; however, due to a transcription error by a medical technician, Hunter failed to retest contaminated blood, causing damage to Alpha. *Id.* at 369. St. Paul Fire & Marine Insurance, Hunter's insurance company, had issued a comprehensive general liability insurance policy containing a professional services exclusion, and, based on this exclusion, St. Paul declined to defend and to indemnify Hunter. *Id.* Hunter contended that "a medical technician is not a profession" and that the medical technician's transcription error could not be deemed a professional service. *Id.* at 370. The Eleventh Circuit Court of Appeals disagreed, noting that "[e]ven if a medical technician is not a professional, there are certain professional duties that, when delegated to the medical technician, bring the technician within the definition of 'professional' for insurance purposes." *Id.* The *Alpha Therapeutic* Court observed that some physician duties are non-delegable and that "most professional services involve clerical duties that may lead to liability." *Id.* The Circuit Court also noted

that "transposing test results and figures is an intricate part of testing plasma for hepatitis, which is a professional service." *Id.* at 371. The Court concluded that "liability is excluded from coverage by the professional service exclusion clause." *Id.*

By contrast, in *Atlantic Lloyd*, the Texas Court of Appeals ruled that a solicitation letter sent by a law firm to a prospective client was not a professional service because it did not "render legal services and does not constitute the practice of law." 982 S.W.2d at 476. The appeals court wrote that "[p]rofessional services are considered those acts which use the inherent skills *typified* by that profession, not *all* acts associated with the profession." *Id.* (emphasis in original).

In *Bohreer v. Erie Ins. Group*, 475 F. Supp. 2d 578 (E.D. Va. 2007), a federal district court addressed an unusual set of facts, where a widow received a box from a crematory labeled "Family Pet Cremations" but with her late husband's name on the label. *Id.* at 581. Later the contents were determined to be non-human, and the record did not disclose the whereabouts of her husband's remains. *Id.* The district court concluded that the professional services exclusion applied because the complaint alleged that the defendant crematory of "mishandle[ing] the cremains," "not safeguard[ing] or controll[ing] the body," not "provid[ing] Plaintiffs with the unadulterated created remains," and "improperly cremat[ing] the body and remains of Marion Jay Bohreer." *Id.* at 586. The district court concluded that these claims "fall squarely within the professional services exclusion, as they arise out of, or are inextricably intertwined with the professional service of cremation." *Id.* The *Bohreer* Court observed that in order to properly perform cremation services, it is

"unmistakably necessary to maintain a chain of custody to ensure that the proper unadulterated created remains are delivered to the proper recipient." *Id.* at 587. Thus, "where, as here, the 'clerical' act is necessary to perform the professional service properly, that act 'arises out of' a professional service." *Id.*

Finally, in *Assurance Company of America v. The American Registry of Radiologic Technologists*, 64 F. Supp. 3d 1289 (D. Minn. 2014), a district court addressed a lawsuit by patients of a hospital against The American Registry of Radiologic Technologists. Although the patients were supposed to receive Fentanyl, a radiologic technologist, who carried Hepatitis C, stole the filled syringes, injected himself with Fentanyl, filled the used syringes with saline solution, and injected the saline into the patients. *Id.* at 1291-92. The patients filed suit against The American Registry on the theory that The American Registry was negligent in investigating complaints against the radiologic technologist. *Id.* at 1292. Finding that the credentialling of a radiologic technologist requires the exercise of professional judgment, the district court concluded that the professional services exclusion applied. *Id.* at 1297-1301.

### 3.    The *Rivera-Matos* Ruling

Combining the *Rivera-Matos* decision and its cited caselaw, the Court concludes first that the fact that an insured's employee made a clerical error does not necessarily mean that the professional services exclusion does not apply. Instead, the Supreme Court of Puerto Rico wrote that the courts must "focus on the **nature of the conduct alleged**." *Rivera-Matos*, 204 D.P.R. at 1027 (emphasis in original).

82

In *Rivera-Matos*, the janitorial company "accepted that its **contract** was precisely 'to carry out **specialized services** in the facilities of the Hospital." *Id.* at 1029. The *Rivera-Matos* Court also observed that the deaths of the sixty patients in that case had not been caused by routine janitorial services but by a failure to perform the specialized type of cleaning that a hospital requires and that the janitorial service said it provided. *Id.*

Even though under *Rivera-Matos*, the nature of the alleged conduct controls coverage, the decisions the Supreme Court cited look to the qualifications of the person who is alleged to have caused the harm. In *Tinervin*, the Florida Court of Appeals observed that the physician's wife fit within the statutory definition of medical assistant; in *Duncanville* and *Assurance Company*, the courts stressed that the tortfeasors were radiological technicians; and, in *Alpha Therapeutic*, the tortfeasor was a medical technician. Thus, as one factor, courts have looked to the employee's training and analyzed whether the tortious act required specialized training.

Unfortunately, based on the sparse factual record before the Court, the Court cannot definitively rule on whether the exclusion applies here.

### 4.  The Facts

To determine whether the professional services exclusion applies, the Court must compare the facts of the case against the language of the issued policy as illuminated by the Supreme Court of Puerto Rico. Unfortunately, based on the sparse

83

and contested factual record before the Court, the Court cannot definitively rule on whether the exclusion applies here.

To set the stage, the Court is not clear about Hogar and Ms. Betancourt's roles in the events that led to Ms. Navarro-Ayala's deterioration and death. The Third Amended Complaint alleges:

> 111. Before Mrs. Navarro's death, Mrs. Betancourt and Bella Unión's personnel incorrectly informed the physicians in charge of Mrs. Navarro's healthcare that she was a practicing Jehovah Witness.
>
> 112. Mrs. Navarro was not a practicing Jehovah Witness.
>
> 113. Based on the incorrect information provided by Mrs. Betancourt and Bella Unión's personnel, the physicians in charge of Mrs. Navarro's health incorrectly and negligently refrained from ordering a blood transfusion to Mrs. Navarro.

From these allegations, it sounds like Ms. Betancourt and the Hogar staff obtained inaccurate information about Ms. Navarro-Ayala's religion and communicated this inaccuracy to Ms. Navarro-Ayala's treating physicians, who then acted (or failed to act) in accordance with this misinformation to Ms. Navarro-Ayala's detriment.

But the statements of material fact tell a conflicting story. Some reflect facts that support this version of the events. Ms. García-Navarro's nurse testified that Hogar personnel told him that Ms. Navarro-Ayala was a Jehovah Witness, who could not receive a blood transfusion. PSMF ¶ 15; DRPSMF ¶ 15. Similarly, the MHAASA report of July 1, 2016, stated that after conducting its investigation, it concluded that Hogar had failed to keep complete patient records in violation of Regulation No. 8283. DSMF ¶ 43; PRDSMF ¶ 1. MHAASA recommended in its report that Hogar receive an administrative fine for failing to keep a complete patient record of Ms. Navarro

which caused miscommunication of information with the treating physicians. DSMF ¶ 44; PRDSMF ¶ 7.

Among other things, the MHAASA report concluded that Hogar failed to maintain a file for Ms. García-Navarro's mother. PSMF ¶ 9; DRPSMF ¶ 9. The report also states that personnel from Hogar incorrectly informed healthcare providers that Ms. García-Navarro's mother could not receive a blood transfusion due to her religious beliefs, even though that she had a hemoglobin level of 4.5 grams. PSMF ¶ 10; DRPSMF ¶ 10.

The MHAASA report states that: "it is the opinion of the Office of Quality that negligence was committed both on the part of the home and on the part of the resident's primary physicians." DSAMF ¶ 13; PRDSAMF ¶ 1. The report also "recommended to refer Dr. Oscar García to the Family Medicine Institute, which provided services through the Mi Salud plan to the resident CAN, to the Ethics Committee of the Puerto Rico Surgical Physicians Association, based on the findings presented." DSAMF ¶ 14; PRDSAMF ¶ 1.

This scenario makes it at least plausible that someone unnamed within Hogar incorrectly noted Ms. Navarro-Ayala was a Jehovah Witness and had a religious objection to transfusions, and that this misinformation was communicated to her treating physicians, who in turn did not order transfusions based on their inaccurate view that they were complying with her religious wishes. If this description of the events, which is consistent with the allegations in the complaint, is correct, the facts edge much closer to coverage even after *Rivera-Matos*.

A second and distinct view of the events appears in the statements of material fact. Ms. García-Navarro quotes a text message conversation on March 23, 2016 between Ms. García-Navarro and Ms. Betancourt in which they discussed Ms. Navarro-Ayala's low hemoglobin lab results. PSMF ¶ 12; DRPSMF ¶ 12. Ms. Betancourt states that she "explained to [the doctor] about your religion and he will get it (the hemoglobin) to rise without having to give her a transfusion, provided she improves." *Id.* Ms. García-Navarro replies in part: "I really would not like her to have more blood transfusion because even though Mami is not a Jehovah's Witness[,] that is very risky at times." *Id.* From this conversation, it seems that Ms. Betancourt took it upon herself to tell Ms. Navarro-Ayala's treating physician that her daughter was a Jehovah's Witness, had a religious preference against blood transfusions, and the doctor allowed the daughter's religious preference to override the best interest of his patient, Ms. Navarro-Ayala.

The problem is that the parties have not presented a sufficient, agreed-upon record so that the Court can make a coverage decision consistent with *Rivera-Matos*. Under one scenario, an unnamed person at Hogar obtained information from an unnamed source that Ms. Navarro-Ayala was a Jehovah's Witness, documented (or failed to document) that erroneous information, and shared that misinformation with her treating physicians, who treated Ms. Navarro-Ayala in a manner consistent with what they understood was her religious convictions. Under a second scenario, the director of the nursing home, whose qualifications are not a matter of record, learned that Ms. Navarro-Ayala's daughter had religious scruples and the director told the

treating physician about the daughter's religious views in order to affect the doctor's treatment of his patient.  A third scenario is also possible, one that combines the first two.

Another factor not a matter of record is a more precise description of the nature of Hogar's business and its relationship to the cause of Ms. Navarro-Ayala's death. The *Rivera-Matos* Court emphasized that the janitorial service in that case was a specialized business and that its actions leading to the deaths of the sixty-three patients were directly related to its specialized nature.  Here, the declaration page of the policy describes Hogar's classification as "Health Care Facilities – Homes for the Aged – Other Than Not-For-Profit."  *Universal Ins. Policy* at 8.

In *Rivera-Matos*, the Puerto Rico Supreme Court raised the concern that if the professional services exclusion is broadly read, a "literal interpretation of the exclusion, as proposed by [the insurer] would practically render the policy ineffective, since it would automatically exclude all of the works of the [insured]."  *Rivera-Matos*, 204 D.P.R. at 1027.  If the Court rules that there is no coverage for Hogar and for Ms. Betancourt under Universal's general commercial liability policy, the Court would be interested in the parties' views as to what remaining risks Universal would cover under this policy.

To place this issue in perspective, if Hogar incorrectly listed Ms. Navarro-Ayala's religion in its initial entry form to the nursing home, this clerical mistake would be more like a purely clerical act.  Such information would not ordinarily have a medical purpose, but rather could be used to determine whether she wished to be

87

visited by a local priest, whether she wished to receive communion, whether she had any dietary restrictions based on religion, and other non-medical issues. By contrast, if the misinformation appeared in a chart that contained Ms. Navarro-Ayala's medical history, Universal would have a stronger argument that the "actions or omissions of the [nursing home] staff constitute an integral and necessary part of the professional service contracted." *Id.* at 1030. The record, however, is silent on this issue.

The Court does not know whether the parties disagree about the events leading to Ms. Navarro-Ayala's death, particularly how Hogar obtained information about Ms. Navarro-Ayala's alleged religion and how it was communicated to the physicians. Given these principles and the unsettled state of the record, the admonition of the Supreme Court of Puerto Rico in *Rivera-Matos* is significant, namely that if there is a dispute over material facts, a court should not decide a coverage issue. *Id.* at 1031.

### G.    Jacqueline García-Navarro's Motion for Rule 11 Sanctions

On February 11, 2022, Ms. García-Navarro moved for sanctions against Universal for its failure to comply with the duty to defend Hogar. *Sanctions Mot.* at 1-6. In her motion, Ms. García-Navarro focuses solely on Universal's failure or refusal to accord a defense to its insured, Hogar. *Id.* Ms. García-Navarro contends that Universal's attorneys violated Rule 11 by insisting that it did not owe a duty to defend Hogar. *Id.* Universal objects to the motion. *Universal Sanctions Opp'n* at 1-6.

On August 15, 2018, Universal filed a motion for summary judgment on the issue of coverage, *Mot. for Summ. J.* (ECF No. 111), and in its October 9, 2018 reply,

Universal argued that the professional services exemption excluded clerical services, which are "an intrinsic part of professional services." *Reply to Pl.'s Resp. in Opp'n to Mot. for Summ. J. Filed by Universal Ins. Co.* at 8-9 (ECF No. 141). In its argument, Universal cited *Alpha Therapeutic*, the 1989 Eleventh Circuit case that the Supreme Court of Puerto itself cited in *Rivera-Matos.* 204 D.P.R. at 1023 (citing *Alpha Therapeutic*, 890 F.2d at 788). As the Supreme Court of Puerto Rico effectively later adopted the standard Universal was urging in October 2018, the Court does not conclude that Universal's positing that standard violated Rule 11. The next question is whether Universal's argument that its duty to defend should be measured by *Rivera-Matos*, not *Viruet.* Even though the Court ruled against Universal on this point, it does not conclude that Universal's argument violated Rule 11.

## VI.   CONCLUSION

The Court issues the following orders:

(1) The Court GRANTS in part, DENIES in part, and DISMISSES in part without prejudice Ms. García-Navarro's Motion for Partial Summary Judgment (ECF No. 450), holding that, as a matter of law, Universal breached its duty to defend Hogar, that the settlement agreement is reasonable, that Universal failed to establish that the settlement agreement is void for fraud, collusion, or lack of good faith, denying in part summary judgment as to whether Universal is barred by issue preclusion in challenging its duty to indemnify, and dismissing without prejudice in part Ms. García-Navarro's claim that the Universal commercial general

liability policy provides indemnity coverage for Ms. García-Navarro's allegations and her claims that Universal acted in bad faith in denying indemnity.

(2) The Court DENIES in part, GRANTS in part, and DISMISSES in part without prejudice Universal's Motion for Partial Summary Judgment (ECF No. 441). The Court denies Universal's Motion for Partial Summary Judgment insofar as it requests an order that Universal owed no duty to defend Hogar, grants Universal's Motion for Partial Summary Judgment insofar as it requests an order that the law of the case doctrine does not prohibit relitigation of its indemnity coverage defense in light of *Rivera-Matos*, and dismisses in part Universal's Motion for Partial Summary Judgment insofar as it requests an order ruling that its general commercial liability policy did not provide indemnity coverage for Jacqueline García-Navarro's claims against Hogar La Bella Unión.

(3) Finally, the Court DENIES Jacqueline García-Navarro's Motion Requesting Rule 11 Sanctions against Universal Insurance Company (ECF No. 469).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of October, 2022